# LEE *v.* ILLINOIS

No. 84–6807.   Argued December 9, 1985—Decided June 3, 1986

BRENNAN, J., delivered the opinion of the Court, in which WHITE, MAR-SHALL, STEVENS, and O'CONNOR, JJ., joined. BLACKMUN, J., filed a dissenting opinion, in which BURGER, C. J., and POWELL and REHNQUIST, JJ., joined, *post*, p. 547.

*Dan W. Evers* argued the cause for petitioner. With him on the briefs was *Randy E. Blue.*

*Jill Wine-Banks*, First Assistant Attorney General of Illinois, argued the cause for respondent. With her on the brief were *Neil F. Hartigan*, Attorney General, and *Mark L. Rotert.*

JUSTICE BRENNAN delivered the opinion of the Court.

Petitioner and a codefendant, charged with committing a double murder, were tried jointly in a bench trial. Neither defendant testified at trial. In finding petitioner guilty as charged, the trial judge expressly relied on portions of the codefendant's confession, obtained by police at the time of arrest, as substantive evidence against petitioner. The question for decision is whether such reliance by the judge upon the codefendant's confession violated petitioner's rights as secured by the Confrontation Clause of the Sixth Amendment,[1] as applied to the States through the Fourteenth Amendment.

---

[1] The Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ."

## I

In February 1982, police officers of East St. Louis asked petitioner Millie Lee to come to the police station to help identify a badly burned body that the police had discovered in an apartment in the housing complex in which Lee lived. While Lee was examining photographs of the body, a detective noticed that she began to cry. The detective advised Lee of her *Miranda* rights, and began to question her about the whereabouts of her aunt, Mattie Darden,[2] with whom Lee shared an apartment. After giving a number of confused and conflicting accounts concerning when she had last seen or talked to her aunt, Lee finally admitted that she and her boyfriend, Edwin Thomas, had been involved in the stabbing of both Aunt Beedie and her friend, Odessa Harris, and that the body was her Aunt Beedie's. At that point, the officers questioning Lee again read her her *Miranda* rights, placed her under arrest, and continued to question her. After concluding their interview with Lee, the police presented her with a typewritten account of her statement, which included at the top of the first page a recitation and waiver of her *Miranda* rights. Lee read and signed each page of the confession.

Petitioner's codefendant, Edwin Thomas, arrived at the police station, ostensibly for "questioning" about the homicides, while police officers were still in the process of interviewing Lee; nonetheless, the police apparently were sufficiently informed of Thomas' involvement such that upon his arrival, he was read his rights and confronted by an officer with his alleged participation in the murders. Thomas indicated at that point that he "wanted to think about" whether to talk to the police.

During her questioning by the police, Millie Lee had asked to see Edwin Thomas; after being advised of his rights, Thomas asked if he could see Lee. After they obtained Lee's confession, the police allowed the two to meet. Lee

---

[2] Mattie Darden was known also as "Aunt Beety" or "Aunt Beedie."

and Thomas were permitted to kiss and to hug, and one of the officers then asked Lee, in the presence of Thomas, "what was the statement you had just given us implicating Edwin?" Lee said to Thomas: "They know about the whole thing, don't you love me Edwin, didn't you in fact say . . . that we wouldn't let one or the other take the rap alone." Brief for Respondent 6. At that point, Thomas gave a statement to the police, which was later typed and then presented to Thomas for his review and signature.

According to Lee's statement, on the evening of February 11, 1982, she and Thomas were at home in the apartment that Lee shared with Aunt Beedie when the aunt and her friend Odessa Harris arrived at approximately 8:30 or 9 p.m. Aunt Beedie and Odessa went into the bedroom, while Lee did the dishes in the kitchen. Thomas, who had been watching television, joined Lee in the kitchen, and the two apparently had "two or three words not really an argument." Odessa then came out of the bedroom to the kitchen and asked "what the hell was going on." As related in Lee's confession, Odessa "said we ought to be ashamed of ourselves arguing and making all that noise. I told her it was none of her business that she didn't live here." Odessa returned to the bedroom. App. 6.

As Lee's account further related, after Odessa returned to the bedroom Lee called her back into the kitchen in order to confirm whether Aunt Beedie had "really" paid the rent. Odessa assured Lee that the rent had indeed been paid, and then complained once more about the fact that Lee and Thomas had been arguing. As Odessa left the kitchen to return to the bedroom, she passed Thomas and gave him "dirty looks." When Odessa turned her head Thomas got up from his chair and stabbed Odessa in the back with a 24-inch-long knife. Odessa fell on the floor, and called out to Aunt Beedie. Lee explained that she then

"ran, well I don't know if I ran or walked into the bedroom. Edwin was standing over by the kitchen cabinet with the knife in his hand with blood on it. Odessa was

laying there moaning. When I went into the bedroom my aunt Beety was sitting on the bed and then she got up and had a knife in her hand. I don't know where the knife came from, my aunt usually kept her gun by her bed. I don't know what kind of gun it is. When my aunt got up off the bed she told me to get out of her way or she would kill me and then she swung at me with the knife. I ran into the kitchen and got a butcher knife that was sitting on the kitchen table and then I went back into the bedroom where my aunt was and then I stabbed her. I kept stabbing her. The first time I stabbed her, I hit her in the chest, I kept stabbing her and I really don't know where else I stabbed her, I had my eyes closed some of the time." *Id.*, at 7.

Lee's statement also included an account of some of the circumstances leading up to the killing:

"Me, and Edwin had talked about stop[p]ing aunt Mattie from harassing me before. She would come in drunk or would get on the phone and tell people that I never did anything for her that I wouldn't give her anything to eat, or anything since I had a boyfriend. . . . Edwin used to get mad when my aunt would talk about me and that he couldn't take much more of what my auntie was doing, that when he began talking about doing something to aunt Beetty *[sic]* but he never said what. Odessa was always jumping up in my face and one time about a month ago me and Odessa got into an argument about my dress that I let Odessa use and Edwin seen her get in my face that time. He, Edwin just couldn't stand to see my auntie or Odessa harass me anymore. Things just kept adding up and adding up and the night that we killed Odessa and my aunt Beetty *[sic]* Edwin just couldn't take anymore." *Id.*, at 12.

Thomas' confession paralleled Lee's in several respects. It described the argument between himself and Lee, the con-

frontation with Odessa in the kitchen, and the stabbings of Odessa and then Aunt Beedie. However, Thomas' statement provided an altogether different version of how he and Lee came to commit the murders. Most significantly, Thomas stated that he and Lee had previously discussed killing Aunt Beedie, and referred to conversations immediately prior to the murders that suggested a premeditated plan to kill. According to Thomas, after Odessa scolded Lee for arguing with Thomas:

> "This is when I asked [Lee] 'did she still want to go through with it?' I was referring to what we had plained [sic] before about killing Aunt Beedie. We had talked about doing something to Aunt Beedie, but we had not figure out just what we would do. We had never before discussed doing anything to Odessa just Aunt Beedie, because we were tired of Aunt Beedie getting drunk, and coming home and 'going off' on [Lee]. . . . After asking [Lee], 'did she still want to do it?' [Lee] first gave me a funny look, as though she was not going to do it, she stared into space for awhile, then she looked at me and said, 'yes.'
>
> "We decided that if we did something to Aunt Beedie, we had to do somthing [sic] with Odessa. We wanted Odessa to leave, but she stayed there. We had plained [sic] that [Lee] was suppose [sic] to get Odessa to stand, with her back toward the front room, looking into the kitchen, while I would grab her from the back, using the big knife." *Id.*, at 17–18.

Lee's statement, by contrast, suggested that it was Thomas who had been provoked by Aunt Beedie's behavior and Thomas who had snapped the night of the murders. Her statement made no mention of an alleged decision by herself and Thomas to "go through with it," nor, of course, did it indicate that the two had formulated a plan to induce Odessa to return to the kitchen where Thomas would kill her. On

the contrary, Lee asserted that on the night of the killings "Edwin just couldn't take anymore."

Lee and Thomas were charged in a two-count indictment with murder. Count one charged them with the murder of Aunt Beedie, and count two with the murder of Odessa. They were appointed separate counsel for trial.

On the day of trial, counsel for the two defendants withdrew motions for severance and for trial by jury. In withdrawing the motion for separate trials, counsel for Thomas explained that "[s]ince we are having a Bench Trial, the Court would only consider the evidence proper to each defendant, we feel that there is no longer any need for that motion." The court then asked petitioner's lawyer whether that was her understanding as well. She replied: "Yes, your Honor. I have conferred with Miss Lee. We would ask the Court to consider the evidence separately for each defendant." The judge replied: "It will be done that way." Tr. 3.

Neither defendant testified at trial, except on behalf of their respective motions to suppress their statements on the ground that they were given involuntarily, motions that were denied by the trial judge.

At trial both the prosecution and the defendants relied heavily on the confessions. In closing, counsel for petitioner called the court's attention to Lee's confession, and argued that it showed that Lee was "not responsible for the death of Odessa Harris. . . . As I read her statement, she was not personally involved in the stabbing of Odessa Harris. Mr. Thomas was." *Id.*, at 232–233. Counsel maintained that under Illinois law, in order to be guilty of murder a person must be involved before or during the commission of the offense, and that Lee's confession simply could not fairly be read to support such a finding. With respect to Aunt Beedie's killing, counsel urged the court to consider the lesser charge of voluntary manslaughter. According to counsel, Lee's statement indicated that Aunt Beedie had had

a knife, that Lee and Aunt Beedie had struggled, and that the stabbing occurred as a result of that struggle. Counsel suggested that Lee had acted either upon the "unreasonable belief that her act of stabbing Mattie Darden constituted self-defense" or, in the alternative, that the killing "was the result of a sudden and intense passion resulting from serious provocation." Brief for Petitioner 5.

In rebuttal, the prosecutor described Lee's arguments in support of lesser offenses as "interesting." He answered the suggestion that the evidence showed insufficient intent to support murder by asserting that "once you read the confession of Millie Lee, you will note that she indicates in her statement that before anything begins, . . . that she and Edwin spoke together . . . at which time Edwin asked her, 'Are you ready?' And she, after thinking awhile, said, 'Yes.'" The prosecutor maintained that this exchange, which he incorrectly attributed to Lee's statement, and which had in fact appeared only in Thomas' confession, demonstrated a willingness on the part of Lee to "go through with whatever plan" the two had formulated with respect to the victims, and thus that there had been an agreement to kill. The State also argued in closing—again erroneously drawing from Thomas', not Lee's, confession—that Lee "did in fact aid and assist and encourage this whole operation, by drawing Odessa out of the bedroom"; the prosecutor argued that this was evident from Thomas' statement that it was necessary to kill Odessa in order to go ahead with the plan to kill Aunt Beedie. To prove Lee's intent to kill and to rebut her theories of self-defense and sudden and intense passion, the State pointed to Thomas' assertion that he had asked Lee if she was willing to go through with what they had talked about, and her reply "I'm scared, but I will go through with it."[3] Tr. 236.

---

[3] It is evident that the prosecutor, in arguing Lee's guilt, invited the court to consider Thomas' confession, an invitation that the court accepted and which generated the error that we address in this opinion. However, there has been no claim made regarding the significance, if any, of prosecu-

In finding Lee guilty of the murders of Aunt Beedie and Odessa, and explaining why he rejected Lee's assertions that she had not participated in the killing of Odessa and that she acted either in self-defense or under intense and sudden passion with respect to the stabbing of Aunt Beedie, the trial judge expressly relied on Thomas' confession and his version of the killings, particularly with respect to the decision to kill Aunt Beedie allegedly made earlier by Lee and Thomas. Lee's contentions, the judge declared, were

> "disputed by the statement of her co-defendant, who stated that he asked Miss Lee do you want to go through with it. A previously conceived plan to dispose of Miss Darden. And after some thinking . . . she responded that she did. There is no showing that they acted under a sudden and intense passion, in fact prior to the stabbing, according to his own confession, the defendant took a knife . . . and awaited the arrival of Miss Harris into the kitchen, in fact had his co-defendant call her so she could come out. Now that isn't a sudden and intense passion." App. 25.

Lee was sentenced to a term of 40 years' incarceration for the murder of Odessa, and life imprisonment for the murder of Aunt Beedie.

On appeal, Lee contended, among other things, that her Confrontation Clause rights were violated by the trial court's consideration of Thomas' confession against her. The state appeals court conceded that the trial court considered Thomas' confession in finding Lee guilty, but held that since the defendants' confessions were "interlocking," they did not fall within the rule of *Bruton* v. *United States*, 391 U. S. 123 (1968), which, the court stated, was that the "admission of a codefendant's extrajudicial statement that inculpates the

---

torial misconduct or mistake that results in inadmissible hearsay evidence being brought to the attention of the factfinder, and we thus do not address the question.

other defendant violates the defendant's Sixth Amendment right to confront witnesses against him." 129 Ill. App. 3d 1197, 491 N. E. 2d 1391 (1984). The court did not explain what it meant by saying that the confessions were "interlocking," how the confessions interlocked, or how or why the *Bruton* analysis would be altered when confessions did interlock. The Illinois Supreme Court denied leave to appeal. We granted certiorari. 473 U. S. 904 (1985).

## II

The State of Illinois concedes that this case involves the use of a codefendant's confession as substantive evidence against petitioner. Brief for Respondent 9. Illinois also correctly recognizes that the admissibility of the evidence as a matter of state law is not the issue in this case; rather, it properly identifies the question presented to be "whether that substantive use of the hearsay confession denied Petitioner rights guaranteed her under the Confrontation Clause. . . ." *Id.*, at 11. It contends, in essence, that Lee's Sixth Amendment rights were not violated because Thomas was unavailable and his statement was "reliable" enough to warrant its untested admission into evidence against Lee. See *Ohio* v. *Roberts,* 448 U. S. 56 (1980). We need not address the question of Thomas' availability, for we hold that Thomas' statement, as the confession of an accomplice, was presumptively unreliable and that it did not bear sufficient independent "indicia of reliability" to overcome that presumption.

## A

In *Pointer* v. *Texas,* 380 U. S. 400 (1965), this Court unanimously held that the Confrontation Clause was applicable to the States, and in doing so, remarked that it "cannot seriously be doubted at this late date that the right of cross-examination is included in the right of an accused in a criminal case to confront the witnesses against him." *Id.*, at 404. Citing and quoting from such cases as *Kirby* v. *United States,*

174 U. S. 47 (1899), *Alford* v. *United States,* 282 U. S. 687 (1931), *Greene* v. *McElroy,* 360 U. S. 474 (1959), *In re Oliver,* 333 U. S. 257 (1948), and *Turner* v. *Louisiana,* 379 U. S. 466 (1965), we observed that "[t]here are few subjects, perhaps, upon which this Court and other courts have been more nearly unanimous than in the expressions of belief that the right of confrontation and cross-examination is an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal." *Pointer, supra,* at 405.

On one level, the right to confront and cross-examine adverse witnesses contributes to the establishment of a system of criminal justice in which the perception as well as the reality of fairness prevails. To foster such a system, the Constitution provides certain safeguards to promote to the greatest possible degree society's interest in having the accused and accuser engage in an open and even contest in a public trial. The Confrontation Clause advances these goals by ensuring that convictions will not be based on the charges of unseen and unknown—and hence unchallengeable—individuals.

But the confrontation guarantee serves not only symbolic goals. The right to confront and to cross-examine witnesses is primarily a functional right that promotes reliability in criminal trials. In *California* v. *Green,* 399 U. S. 149, 158 (1970), we identified how the mechanisms of confrontation and cross-examination advance the pursuit of truth in criminal trials. Confrontation, we noted,

> "(1) insures that the witness will give his statements under oath—thus impressing him with the seriousness of the matter and guarding against the lie by the possibility of a penalty for perjury; (2) forces the witness to submit to cross-examination, the 'greatest legal engine ever invented for the discovery of truth'; (3) permits the jury that is to decide the defendant's fate to observe the demeanor of the witness making his statement, thus aiding the jury in assessing his credibility" (footnote omitted). *Ibid.*

Our cases recognize that this truthfinding function of the Confrontation Clause is uniquely threatened when an accomplice's confession is sought to be introduced against a criminal defendant without the benefit of cross-examination. As has been noted, such a confession "is hearsay, subject to all the dangers of inaccuracy which characterize hearsay generally. . . . More than this, however, the arrest statements of a co-defendant have traditionally been viewed with special suspicion. Due to his strong motivation to implicate the defendant and to exonerate himself, a codefendant's statements about what the defendant said or did are less credible than ordinary hearsay evidence." *Bruton* v. *United States*, 391 U. S., at 141 (WHITE, J., dissenting) (citations omitted).

Thus, in *Douglas* v. *Alabama*, 380 U. S. 415 (1965), we reversed a conviction because a confession purportedly made by the defendant's accomplice was read to the jury by the prosecutor. Because the accomplice in that case, while called to the witness stand, invoked his privilege against self-incrimination and refused to answer questions put to him, we held that the defendant's "inability to cross-examine [the accomplice] as to the alleged confession plainly denied him the right of cross-examination secured by the Confrontation Clause." *Id.*, at 419. This holding, on which the Court was unanimously agreed, was premised on the basic understanding that when one person accuses another of a crime under circumstances in which the declarant stands to gain by inculpating another, the accusation is presumptively suspect and must be subjected to the scrutiny of cross-examination.

Over the years since *Douglas*, the Court has spoken with one voice in declaring presumptively unreliable accomplices' confessions that incriminate defendants. Even Justice Harlan, who was generally averse to what he regarded as an expansive reading of the confrontation right, stated that he "would be prepared to hold as a matter of due process that a confession of an accomplice resulting from formal police interrogation cannot be introduced as evidence of the guilt of

an accused, absent some circumstance indicating authorization or adoption." *Dutton* v. *Evans*, 400 U. S. 74, 98 (1970) (concurring in judgment).

Our ruling in *Bruton* illustrates the extent of the Court's concern that the admission of this type of evidence will distort the truthfinding process. In *Bruton*, we held that the Confrontation Clause rights of the petitioner were violated when his codefendant's confession was admitted at their joint trial, despite the fact that the judge in that case had carefully instructed the jury that the confession was admissible only against the codefendant. We based our decision in *Bruton* on the fact that a confession that incriminates an accomplice is so "inevitably suspect" and "devastating" that the ordinarily sound assumption that a jury will be able to follow faithfully its instructions could not be applied. *Bruton, supra,* at 136.

Although in the present case the state court apparently relied on *Bruton* in reaching its decision, this is not strictly speaking a *Bruton* case because we are not here concerned with the effectiveness of limiting instructions in preventing spill-over prejudice to a defendant when his codefendant's confession is admitted against the codefendant at a joint trial. Rather, this case is strikingly similar to *Douglas*. Here, as in *Douglas*, the State sought to use hearsay evidence as substantive evidence against the accused. In both cases, the hearsay in question was a confession made by an alleged accomplice, and in neither case was the defendant able to confront and cross-examine the declarant. Whatever differences there are between the cases show clearly that in the present case the Confrontation Clause concerns are of even greater consequence than in *Douglas*. In *Douglas*, the accomplice's confession was read by the prosecutor to the uncooperative declarant in order to "refresh [his] recollection," 380 U. S., at 316, and was thus technically not evidence that was admitted against the accused; in the present case, Thomas' statement was, of course, admitted into evidence by

the judge following a suppression hearing. Moreover, here, unlike *Douglas*, it is not necessary to speculate as to whether the factfinder would consider the uncross-examined hearsay; the judge expressly so relied. In this case the Court does not address a hypothetical. The danger against which the Confrontation Clause was erected—the conviction of a defendant based, at least in part, on presumptively unreliable evidence—actually occurred.

## B

Illinois contends that Thomas' statement bears sufficient "indicia of reliability" to rebut the presumption of unreliability that attaches to codefendants' confessions, citing as support our decision in *Ohio* v. *Roberts*, 448 U. S., at 66 (citations omitted). While we agree that the presumption may be rebutted, we are not persuaded that it has been in this case.

In *Roberts*, we recognized that even if certain hearsay[4] evidence does not fall within "a firmly rooted hearsay exception" and is thus presumptively unreliable and inadmissible for Confrontation Clause purposes, it may nonetheless meet Confrontation Clause reliability standards if it is supported by a "showing of particularized guarantees of trustworthiness." *Ibid.* However, we also emphasized that "[r]eflecting its underlying purpose to augment accuracy in the factfinding process by ensuring the defendant an effective means to test adverse evidence, the Clause countenances only hearsay marked with such trustworthiness that 'there is no material departure from the reason of the general rule.'"

---

[4] We have previously turned to McCormick's definition of hearsay as "testimony in court, or written evidence, of a statement made out of court, the statement being offered as an assertion to show the truth of matters asserted therein, and thus resting for its value upon the credibility of the out-of-court asserter." E. Cleary, McCormick on Evidence § 246, p. 584 (2d ed. 1972). We have also quoted approvingly McCormick's caveat that "[s]implification has a measure of falsification." *Ibid.* (quoted in *Ohio* v. *Roberts*, 448 U. S., at 62, n. 4).

*Id.*, at 65, quoting *Snyder* v. *Massachusetts*, 291 U. S. 97, 107 (1934). Illinois' asserted grounds for holding Thomas' statement to be reliable with respect to Lee's culpability simply do not meet this standard.[5]

First, contrary to Illinois' contention, the circumstances surrounding the confession do not rebut the presumption that Thomas' statement could not be trusted as regards Lee's participation in the murders. When Thomas was taken in for questioning and read his rights he refused to talk to the police. The confession was elicited only after Thomas was told that Lee had already implicated him and only after he was implored by Lee to share "the rap" with her. The unsworn statement was given in response to the questions of police, who, having already interrogated Lee, no doubt knew what they were looking for, and the statement was not tested in any manner by contemporaneous cross-examination by counsel, or its equivalent. Although, as the State points out, the confession was found to be voluntary for Fifth Amendment purposes, such a finding does not bear on the question of whether the confession was also free from any desire, motive, or impulse Thomas may have had either to mitigate the appearance of his own culpability by spreading the blame or to overstate Lee's involvement in retaliation for her having implicated him in the murders. It is worth noting that the record indicates that Thomas not only had a theoretical motive to distort the facts to Lee's detriment, but that he also was actively considering the possibility of becoming her adversary: prior to trial, Thomas contemplated becoming a witness for the State against Lee. This record evidence documents a reality of the criminal process, namely, that once partners in a crime recognize that the "jig is up," they tend to

---

[5] We reject respondent's categorization of the hearsay involved in this case as a simple "declaration against penal interest." That concept defines too large a class for meaningful Confrontation Clause analysis. We decide this case as involving a confession by an accomplice which incriminates a criminal defendant.

lose any identity of interest and immediately become antagonists, rather than accomplices.

We also reject Illinois' second basis for establishing reliability, namely, that because Lee's and Thomas' confessions "interlock" on some points, Thomas' confession should be deemed trustworthy in its entirety. Obviously, when codefendants' confessions are identical in all material respects, the likelihood that they are accurate is significantly increased. But a confession is not necessarily rendered reliable simply because some of the facts it contains "interlock" with the facts in the defendant's statement. See *Parker* v. *Randolph*, 442 U. S. 62, 79 (1979) (BLACKMUN, J., concurring in part and concurring in judgment). The true danger inherent in this type of hearsay is, in fact, its selective reliability. As we have consistently recognized, a codefendant's confession is presumptively unreliable as to the passages detailing the defendant's conduct or culpability because those passages may well be the product of the codefendant's desire to shift or spread blame, curry favor, avenge himself, or divert attention to another. If those portions of the codefendant's purportedly "interlocking" statement which bear to any significant degree on the defendant's participation in the crime are not thoroughly substantiated by the defendant's own confession, the admission of the statement poses too serious a threat to the accuracy of the verdict to be countenanced by the Sixth Amendment. In other words, when the discrepancies between the statements are not insignificant, the codefendant's confession may not be admitted.

In this case, the confessions overlap in their factual recitations to a great extent. However, they clearly diverge with respect to Lee's participation in the planning of her aunt's death, Lee's facilitation of the murder of Odessa, and certain factual circumstances relevant to the couple's premeditation. For example, Lee's confession states that Thomas was "talking about doing something to aunt Beetty [sic] but he never said what," App. 12, and does not refer at all to the joint plan to

do "something to Aunt Beedie" which Thomas repeatedly mentions in his confession. *Id.*, at 17. Nor does Lee's confession give any indication that Lee and Thomas colluded to "do somthing *[sic]* with Odessa," *id.*, at 18, as does Thomas' statement. Lee states that she called Odessa into the kitchen only to discuss the rent and that Thomas assaulted Odessa after Odessa had left the kitchen, given Thomas a "dirty loo[k]," and was walking toward the bedroom. *Id.*, at 6. By contrast, Thomas indicates that "[Lee] was suppose *[sic]* to get Odessa to stand, with her back toward the front room, looking into the kitchen" so that Thomas could stab her from the back, *id.*, at 18, and that he actually attacked Odessa while she was in the kitchen at Lee's beckoning. *Id.*, at 19. Finally, there are certain factual discrepancies in the two statements which bear on Lee's alleged pre-existing intent to kill the two women. For example, Thomas states that the couple had thought to put on gloves before the killings, *id.*, at 20, while Lee states that they put on gloves only to dispose of the bodies. *Id.*, at 10.

The subjects upon which these two confessions do not "interlock" cannot in any way be characterized as irrelevant or trivial. The discrepancies between the two go to the very issues in dispute at trial: the roles played by the two defendants in the killing of Odessa, and the question of premeditation in the killing of Aunt Beedie.

In sum, we are not convinced that there exist sufficient "indicia of reliability," flowing from either the circumstances surrounding the confession or the "interlocking" character of the confessions, to overcome the weighty presumption against the admission of such uncross-examined evidence. We therefore hold that on the record before us, there is no occasion to depart from the time-honored teaching that a codefendant's confession inculpating the accused is inherently unreliable, and that convictions supported by such evidence violate the constitutional right of confrontation.[6]

---

[6] Illinois makes the somewhat surprising argument—an argument, incidentally, that was not made before the state court—that this case does not

By holding that the consideration of Thomas' untested confession against Lee violated Lee's Confrontation Clause rights, we do not foreclose the possibility that this error was harmless when assessed in the context of the entire case against Lee. See *Schneble* v. *Florida*, 405 U. S. 427 (1972). However, because the Illinois courts are in a better position to assess the remaining evidence in light of the substantive state law of murder, we leave this determination in the first instance to the state courts. Accordingly, the judgment of the Appellate Court of Illinois, Fifth Judicial District, is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

JUSTICE BLACKMUN, with whom THE CHIEF JUSTICE, JUSTICE POWELL, and JUSTICE REHNQUIST join, dissenting.

I yield to no one in my respect for the Confrontation Clause of the Sixth Amendment, made applicable to the States through the Fourteenth. And I do not denigrate the lofty precepts that have been developed to strengthen its enforcement. I feel, however, that at times this Court tends to be

present any Confrontation Clause issue since Lee was afforded an opportunity to cross-examine Thomas during the suppression hearing. We disagree.

The function of a suppression hearing is to determine the voluntariness, and hence the admissibility for Fifth Amendment purposes, of a confession. The truth or falsity of the statement is not relevant to the voluntariness inquiry, and no such testimony was given by Thomas. Counsel for both Lee and Thomas specifically stated that their clients were testifying "for purposes of the motion to suppress the confession only." Tr. 205, 219. Before either defendant took the stand, the court announced: "Let the record show the testimony of this defendant will be used solely for the purpose of sustaining the motion to suppress previously made." *Id.*, at 205.

Thus, there was no opportunity to cross-examine Thomas with respect to the reliability of the statement, especially as it may have related to Lee, and thus no opportunity for cross-examination sufficient to satisfy the demands of the Confrontation Clause. Cf. *Jackson* v. *Denno*, 378 U. S. 368, 376–377 (1964) (A defendant's constitutional right to a hearing to object to the use of a confession involves a determination of voluntariness, "a determination uninfluenced by the truth or falsity of the confession").

overly concerned with theory and pronounced principles for their own sake, and to disregard the significant realities that so often characterize a criminal case. There is a real world as well as a theoretical one.

This case, centering on two senseless and reprehensible East Saint Louis murders, is illustrative. Petitioner Millie R. Lee and her friend and codefendant, Edwin R. Thomas, each confessed to extensive and cooperative involvement in the crimes. Their corroborated and mutually reinforcing statements stand in vivid contrast to the blame-it-on-the-other-person and buck-passing posturing that usually develops when criminal accomplices are apprehended and each endeavors to rescue himself or herself at the expense of the other. We have nothing of that kind here.

I agree with the Court that this case is governed by *Ohio* v. *Roberts*, 448 U. S. 56 (1980). Under the principles enunciated in that case, Thomas' confession was constitutionally admissible against petitioner *only* if Thomas was "unavailable" as a witness *and* the confession bore sufficient "indicia of reliability." *Id.*, at 65–66. These two requirements serve to ensure that an out-of-court statement is admitted only when it does not threaten the central mission of the Confrontation Clause, which is "to advance a practical concern for the accuracy of the truth-determining process in criminal trials by assuring that 'the trier of fact [has] a satisfactory basis for evaluating the truth of the prior statement.'" *Dutton* v. *Evans*, 400 U. S. 74, 89 (1970) (plurality opinion), quoting *California* v. *Green*, 399 U. S. 149, 161 (1970). Because I believe that each of the *Roberts* requirements was satisfied in this case, I conclude that the trial court's use of the accomplice's confession as evidence against petitioner was constitutionally permissible.[1]

---

[1] As the Court points out, *ante*, at 539, the admissibility of Thomas' confession under Illinois law is not the issue in this case and does not control the question of constitutional admissibility.

I

Recognizing "the Framers' preference for face-to-face accusation," this Court has construed the Confrontation Clause to embody in general "a rule of necessity." *Ohio* v. *Roberts*, 448 U. S., at 65. When a witness is available to testify in court, his prior statement, even if reliable, generally will be inadmissible to prove the truth of what it asserts unless the witness is produced for cross-examination. See *California* v. *Green*, 399 U. S., at 158; *Barber* v. *Page*, 390 U. S. 719 (1968). "In the usual case . . . the prosecution must either produce, or demonstrate the unavailability of, the declarant whose statement it wishes to use against the defendant." *Roberts*, 448 U. S., at 65.[2]

For all practical purposes, Thomas was unavailable as a prosecution witness. Although physically present in the courtroom, he clearly would have invoked his privilege against self-incrimination if called to the stand to describe the murders he had committed with petitioner.[3] Indeed, it is

[2] As this Court recently explained in *United States* v. *Inadi*, 475 U. S. 387 (1986), a specific showing of unavailability is not always required. I nonetheless assume, for purposes of discussion, that in relevant respects Thomas' custodial confession is more like the prior judicial testimony at issue in *Roberts* than like the contemporaneous co-conspirator statements involved in *Inadi*, and thus that both *Roberts* requirements had to be satisfied.

[3] Because the State did not call Thomas to testify, he did not expressly invoke his Fifth Amendment privilege. In the circumstances of this case, however, the absence of this formality is not decisive. Cf. *United States* v. *Thomas*, 571 F. 2d 285, 288 (CA5 1978). Not only would such an effort by the State have been futile, but also Thomas' presence in the courtroom made him as available to petitioner as to the prosecution. Thus, in the exceedingly unlikely event that Thomas would have testified if called, there was no significant denial of petitioner's right to confrontation, because petitioner herself could have called Thomas and questioned him, if necessary, as an adverse witness. The Confrontation Clause does not require that cross-examination actually occur; it requires only that a defendant be given the opportunity for cross-examination or its functional equivalent. See *Ohio* v. *Roberts*, 448 U. S. 56, 70–71 (1980).

precisely Thomas' Fifth Amendment privilege that brought the Confrontation Clause into this case in the first place: although the State "produced" Thomas in court, his right not to testify against himself made him effectively unavailable for cross-examination by petitioner. See *Douglas* v. *Alabama*, 380 U. S. 415, 419 (1965). In much the same way, Thomas' testimony was unavailable to the State. See *Phillips* v. *Wyrick*, 558 F. 2d 489, 494 (CA8 1977), cert. denied, 434 U. S. 1088 (1978).

Illinois, of course, had weapons that petitioner lacked. For example, the State could have offered Thomas a favorable sentencing recommendation, or the opportunity to plead guilty to a lesser offense, in exchange for his testimony against petitioner. Alternatively, the State could have tried Thomas separately and granted him immunity from the use of his inculpatory testimony against petitioner. See *Kastigar* v. *United States*, 406 U. S. 441 (1972). Measures of this kind, however, entail significant costs. A plea agreement necessarily compromises the community's legitimate correctional interests, and a grant of immunity places a heavy evidentiary burden on any future prosecution of the witness. See *id.*, at 460–461. I cannot conclude that the possibility of such an arrangement with petitioner's codefendant rendered him an available witness for purposes of the Confrontation Clause.

My unwillingness reflects in part a respect for established principles of the law of evidence. Although the Confrontation Clause differs in significant ways from the common-law rule against the introduction of hearsay, the two "stem from the same roots," *Dutton* v. *Evans*, 400 U. S., at 86 (plurality opinion), and "protect similar values," *California* v. *Green*, 399 U. S., at 155. As a consequence, analysis under the Confrontation Clause properly is informed, although not constrained, by hearsay principles developed over time by courts and legislatures. See, *e. g.*, *Roberts*, 448 U. S., at 66. Among those principles is the generally accepted notion that

witnesses who successfully invoke the privilege against self-incrimination are "unavailable" for purposes of determining whether their prior statements are admissible under an exception to the hearsay rule. See *California* v. *Green*, 399 U. S., at 168, n. 17; Fed. Rule Evid. 804(a)(1); E. Cleary, McCormick on Evidence § 253 (3d ed. 1984). The judgment embodied in that notion—that a witness who validly invokes the privilege is unavailable as a practical matter to testify—seems to me to be sound, and I see no reason to take a different approach under the Confrontation Clause. I therefore conclude that Thomas was unavailable as a witness.

## II

I also conclude, in the circumstances of this case—and the Court should be realistic about these issues—that the confession of petitioner's codefendant bore adequate "indicia of reliability" to allow its admission into evidence against petitioner. Chief among these indicia is the fact that Thomas' statements were thoroughly and unambiguously adverse to his penal interest. See *United States* v. *White*, 553 F. 2d 310, 314 (CA2), cert. denied, 431 U. S. 972 (1977). The hearsay exception for declarations against interest is firmly established; it rests upon "the principle of experience that a statement asserting a fact distinctly against one's interest is unlikely to be deliberately false or heedlessly incorrect." 5 J. Wigmore, Evidence § 1457, p. 329 (J. Chadbourn rev. 1974).[4] Again, I recognize that the requirements of the

[4] The old view that the interest must be proprietary or pecuniary, not penal, by now has been fully discredited. The refusal of the common law to exempt statements against penal interest from the hearsay rule usually is traced to the decision of the House of Lords in the *Sussex Peerage Case*, 11 Cl. & F. 85, 8 Eng. Rep. 1034 (1844), a case Wigmore describes as "not strongly argued and not considered by the judges in the light of the precedents," 5 J. Wigmore, Evidence § 1476, p. 351 (J. Chadbourn rev. 1974). The doctrine announced there has been termed "barbarous," *id.*, § 1477, p. 360, and "indefensible in logic," Advisory Committee's Notes on Fed. Rule Evid. 804(b)(3), 28 U. S. C. App., p. 733. The rationale for allowing admission of declarations against interest applies no less forcefully when

Confrontation Clause and the hearsay rule often diverge. But statements squarely within established hearsay exceptions possess "the imprimatur of judicial and legislative experience," G. Lilly, An Introduction to the Law of Evidence § 78, pp. 277–278 (1978), and that fact must weigh heavily in our assessment of their reliability for constitutional purposes. See *Roberts*, 448 U. S., at 66.

The majority points out correctly, *ante*, at 541–542, that the Court customarily has treated the confessions of codefendants with suspicion. Never, however, has the Court held such confessions *per se* inadmissible under the Confrontation Clause,[5] and the suspicion the Court has shown in no way contradicts the general reliability of statements against penal interest. Indeed, accomplice confessions ordinarily are untrustworthy precisely because they are *not* unambiguously adverse to the penal interest of the declarant. It is of course against one's penal interest to confess to criminal complicity, but often that interest can be advanced greatly by ascribing the bulk of the blame to one's confederates. It is in circum-

---

the declarant concedes criminal instead of civil liability; indeed, "no other statement is so much against interest as a confession of murder." *Donnelly* v. *United States*, 228 U. S. 243, 278 (1913) (Holmes, J., dissenting). Accordingly, most jurisdictions now allow the introduction, in appropriate circumstances, of out-of-court declarations against penal interest. See E. Cleary, McCormick on Evidence § 278 (3d ed. 1984); Fed. Rule Evid. 804(b)(3).

[5] In *Bruton* v. *United States*, 391 U. S. 123 (1968), the inadmissibility of the codefendant's out-of-court statements against the defendant was not contested; the question was whether limiting instructions were constitutionally adequate to ensure that the jury considered the codefendant's statements only against the codefendant and not against the defendant. See *id.*, at 128, n. 3 ("There is not before us . . . any recognized exception to the hearsay rule . . . and we intimate no view whatever that such exceptions necessarily raise questions under the Confrontation Clause"); see also *Dutton* v. *Evans*, 400 U. S. 74, 86 (1970) (plurality opinion). The *Bruton* rule thus necessarily applies only to situations in which the out-of-court statements are constitutionally inadmissible against the defendant. See *United States* v. *Kelley*, 526 F. 2d 615, 620 (CA8 1975), cert. denied, 424 U. S. 971 (1976).

stances raising the latter possibility—circumstances in which the accomplice's out-of-court statements implicating the defendant may be very much in the accomplice's penal interest—that we have viewed the accomplice's statements as "inevitably suspect." *Bruton* v. *United States*, 391 U. S. 123, 136 (1968); see also *id.*, at 141–142 (WHITE, J., dissenting) ("Due to his strong motivation to implicate the defendant and to exonerate himself, a codefendant's statements about what the defendant said or did are less credible than ordinary hearsay evidence").

Such circumstances were presented starkly in *Douglas* v. *Alabama*, 380 U. S. 415 (1965). The accomplice's confession in that case was "of crucial importance" because it identified the defendant as the triggerman. *Id.*, at 417, and n. 3. Only one shot had been fired, and it obviously was in the accomplice's penal interest to convince the authorities that he was not the one who fired it. By "fingering" the defendant, he minimized his own criminal culpability.

In the present case, however, there is little reason to fear that Thomas' statements to the police may have been motivated by a desire to shift blame to petitioner. Thomas' confession was less favorable in all respects to his own interests than petitioner's confession, and there is no claim by either side that Thomas actually was more culpable than either he or petitioner admitted. Also, Thomas' description of petitioner's involvement in the murders in no way diminished his own complicity. This is particularly so with respect to the matter for which the trial judge relied on Thomas' confession, namely, the joint planning of the murders. Far from minimizing Thomas' own liability, the claim that the two defendants consulted about the crimes immediately before carrying them out damaged Thomas' defense just as much as petitioner's, and subjected both defendants to possible charges of criminal conspiracy.[6]

---

[6] Thomas' statement to the police therefore differs significantly from the typical confession implicating an accomplice. In most cases, the inculpation of the accomplice is "collateral" to the confession, in that the allega-

Not only was Thomas' confession unambiguously adverse to his own penal interest, but it was also extensively corroborated by other evidence introduced at trial. Perhaps the strongest corroboration was provided by petitioner's own confession, which mirrors Thomas' statement in striking detail. Both defendants independently told the police that the murders took place after Odessa Harris came into the kitchen to complain about their arguing. App. 6 (petitioner's confession) ("Odessa . . . asked what the hell was going on"); id., at 17 (Thomas' confession) ("Odessa . . . asked, what's the hell going on"). Both defendants explained that Harris then returned to the bedroom, and that petitioner called her back to the kitchen, at which time Thomas rose from a recliner and stabbed her in the back with a long-blade knife. Id., at 6–7, 18–19. According to both confessions, Odessa Harris fell to the floor and began to call for petitioner's aunt, Mattie Darden, whom petitioner then intercepted in the bedroom with a knife. Id., at 7, 19. Both defendants agreed that while petitioner was in the bedroom she asked Thomas for the hammer, that Thomas could not find it, that petitioner asked Thomas to bring a skillet from the kitchen, that

---

tions implicating the accomplice are not found in portions of the statement directly adverse to the declarant's penal interest. Comment, Federal Rule of Evidence 804(b)(3) and Inculpatory Statements Against Penal Interest, 66 Calif. L. Rev. 1189, 1190, n. 7 (1978).

Moreover, because Thomas' inculpation of petitioner was inseverable from those portions of the confession strongly adverse to his own penal interests, this case presents no special reason to fear that Thomas implicated petitioner in an effort to curry favor with the police. In theory, of course, the entire confession could have been a misguided effort to please the interrogating officers, see, e. g., Parker v. Randolph, 442 U. S. 62, 86, and n. 6 (1979) (STEVENS, J., dissenting), but this possibility is present whenever a suspect confesses while in custody, and it renders the confession no less reliable as evidence against a codefendant than as evidence against the confessing suspect. In this case, moreover, the possibility of a false confession is rendered remote by the circumstances of Thomas' confession, and by the extensive corroboration provided by petitioner's own confession and by the physical evidence. See infra.

Thomas did so, and that the skillet fractured after petitioner struck Darden on the head with it once or twice. *Id.*, at 7, 20. They agreed that Thomas then brought another skillet from the kitchen, that petitioner hit her aunt once more on the head, spraying grease about the room, and that Thomas took over after telling petitioner she was not hitting hard enough. *Id.*, at 8, 20. Both defendants said they had spoken in the past about doing something to stop Darden from harassing petitioner. *Id.*, at 12, 17.[7]

The two confessions, of course, were not identical as to every detail. One could not expect them to be. In particular, the discussion just before the killings, on which the trial judge relied in rejecting petitioner's defense of "sudden and intense passion," was described only in Thomas' statement. For at least two reasons, however, this divergence does not significantly undermine the corroboration provided by petitioner's confession. First, although petitioner did not mention the discussion described by Thomas, the story she told was in no way inconsistent with the occurrence of such a discussion. Nothing she said suggested that joint planning of the kind described by Thomas had *not* taken place. Second, as noted above, Thomas' assertion that he and petitioner consulted immediately before the murders cannot be understood as an attempt to shift blame from Thomas to petitioner. Far from diminishing Thomas' cul-

---

[7] The confessions further agree on the details of the defendants' activities following the murders, the broad outlines of which were as follows: Petitioner and Thomas put Harris' body inside a trunk they found in Darden's bedroom and left the trunk outside by the trash. Petitioner went to a local store to buy lighter fluid, with which she and Thomas set the trunk on fire. Using clothesline and a long aluminum lawn chair, they carried Darden to a vacant apartment. They cleaned the floors of Darden's apartment. The following day, they transferred Harris' remains to a cardboard stereo box, leaving the box with the garbage. Thomas later returned to the vacant apartment and set fire to Darden's body. App. 8–11, 20–24.

pability, that assertion increased his potential liability just as much as it did petitioner's.[8]

In addition to the corroboration provided by petitioner's own confession, the statements given by petitioner and Thomas were fully consistent with the physical evidence. The knives used in the attacks were found where petitioner said they were hidden. See Tr. 183–184. The police also found, among other evidence, the can of lighter fluid used to ignite the bodies of both victims, see *id.*, at 21–22, the broken skillet, see *id.*, at 41–42, and both victims' remains, see *id.*, at 17–18, 67–71, 78–82, 155–157. The wounds found on Darden's body were fully in accord with the story told by both defendants. See *id.*, at 77–78.

Finally, the record amply supports the trial court's determination that the confessions were voluntary. Although petitioner and Thomas were in custody when they gave their statements, each was fully notified of his or her rights, and there is no indication of any police pressure. The interrogating officers testified at trial that the defendants appeared alert and sober during questioning, and that they were not

---

[8] The Court in the past has divided on the significance of "interlocking" confessions for the rule announced in *Bruton* v. *United States*, 391 U. S. 123 (1968). Compare *Parker* v. *Randolph*, 442 U. S., at 74–75 (plurality opinion) (*Bruton* rule is inapplicable to cases involving interlocking confessions), with 442 U. S., at 77–81 (opinion concurring in part and concurring in judgment) (interlocking confessions may make *Bruton* error harmless but do not render the rule inapplicable), and *id.*, at 81–83 (STEVENS, J., dissenting) (same). Since *Bruton* applies only in cases where the codefendant's out-of-court statements are inadmissible against the defendant, see n. 5, *supra*, the views I expressed in *Randolph* necessarily imply, as the Court suggests, that interlocking confessions are not automatically admissible against both defendants. See *ante*, at 545. I adhere to that position. It hardly follows, however, that the corroboration provided by a defendant's own confession is *irrelevant* to a determination whether a codefendant's out-of-court statements are sufficiently reliable to be admissible against the defendant under the Confrontation Clause. Any categorical approach of that kind seems to me to be profoundly unwise.

threatened or cajoled by the police in any way. See *id.*, at 30–31, 37–38, 94–96, 104–106.

It is the unusual conjunction of these indicia of reliability — thorough and unambiguous adversity to Thomas' penal interest, extensive and convincing corroboration by petitioner's own confession, further corroboration provided by the physical evidence, and reliable evidence of voluntariness — that persuades me in this case that the *de facto* admission of the confession of an unavailable witness as substantive evidence against petitioner did not violate the Confrontation Clause. Were any of these elements missing, the result might be different and I might well agree with the Court. Together, however, they kept this trial within constitutional bounds.

## III

The Court's cases have construed the Confrontation Clause in a pragmatic fashion, requiring "substantial compliance" with its purposes, see *Ohio* v. *Roberts*, 448 U. S., at 69; *California* v. *Green*, 399 U. S., at 166, but acknowledging the need to balance the interests of the accused against the public's "strong interest in effective law enforcement," *Roberts*, 448 U. S., at 64; see also *Mattox* v. *United States*, 156 U. S. 237, 243 (1895). I share the Court's general concern regarding the use of an accomplice's confession as evidence against an accused, but I believe that in this case the practical unavailability of petitioner's codefendant as a witness for the State, together with the unusually strong and convincing indications that his statements to the police were reliable, rendered the confession constitutionally admissible against petitioner.

I respectfully dissent.