THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
LORENZO FORD, Defendant-Appellant.

First District (4th Division)   No. 1—91—0294

Opinion filed April 9, 1992.

Randolph N. Stone, Public Defender, of Chicago (Robert D. Glick, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb and Veronica X. Calderon, Assistant State's Attorneys, of counsel), for the People.

JUSTICE LINN delivered the opinion of the court:

Defendant, Lorenzo Ford, was convicted of murder and sentenced to 35 years in prison. His conviction and sentence were affirmed on direct appeal. He filed a *pro se* petition for post-conviction relief and, through appointed counsel, a supplemental petition. The petition was dismissed without an evidentiary hearing.

On appeal, Ford argues that the trial court erred in dismissing the petition because it stated grounds for relief under the Post-Conviction Hearing Act (Ill. Rev. Stat. 1985, ch. 38, par. 122—1 *et seq.*).

We affirm.

BACKGROUND

The post-conviction petition alleged that Ford's trial and appellate attorneys failed to provide him with effective assistance of counsel. Specifically, trial counsel failed to move for a severance of Ford's trial from that of codefendant De Wayne Clemons. In addition, trial counsel failed to move for the suppression of the statement Ford gave while in police custody. Ford's post-conviction petition further asserted that appellate counsel was ineffective for failing to raise those issues on direct appeal.

Ford asserts that the statement of Clemons, who was tried with him, differs from his own statement in the material respect of Ford's mental state at the time he stabbed the victim, Roscoe Jenkins. Clemons told police that he, Clemons, wanted to seek out and fight the victim because of an earlier fight that evening in which the victim had hit a friend of the codefendant's. According to Clemons, Ford took out a knife and said, "I just sharpened this knife and I'm ready to use it, and I hope we bump into the nigger that stole on Steve."

Ford's statement to police, on the other hand, characterizes the events as an unplanned encounter with the victim, who threatened Clemons and charged him. According to Ford, he came to the aid of Clemons and stabbed the victim.

The main thrust of Ford's argument is that he was denied his sixth amendment right to meaningful assistance of counsel because of the failure of his attorney to move to sever the trials of Ford and Clemons. The use of Clemons' statement in the joint trial, he claims, devastated Ford's voluntary manslaughter defense.

OPINION

I

A

At the heart of Ford's argument is the question of when and under what circumstances a court can permit the statement of a nontestifying codefendant, whose statement incriminates the other defendant, to be introduced in a joint trial. (See, *e.g., Cruz v. New York* (1987), 481 U.S. 186, 95 L. Ed. 2d 162, 107 S. Ct. 1714; accord *People v. Mahaffey* (1989), 128 Ill. 2d 388, 539 N.E.2d 1172, *cert. denied* (1989), 493 U.S. 873, 107 L. Ed. 2d 156, 110 S. Ct. 203 (noting that the two defendants' confessions were of the "buck passing" variety and therefore truly unreliable); see also *Lee v. Illinois* (1986), 476 U.S. 530, 90 L. Ed. 2d 514, 106 S. Ct. 2056.) In *Cruz*, one brother confessed that he, along with his brother and two others, robbed a gas station and killed the attendant. The brothers were tried together and the one brother's confession was admitted at trial with a cautionary instruction that the jury could consider the confession against the one brother only. Both brothers were convicted. On appeal, the Supreme Court reversed, holding that where a nontestifying codefendant's confession is not admissible against the other defendant, the confrontation clause of the sixth amendment bars its admission at the joint trial.

In *Lee v. Illinois*, both the defendant, Lee, and codefendant, Thomas, confessed to the stabbing of two people. Their confessions interlocked in several respects, including a description of the argument between codefendants and the confrontation between the victims and the defendants. The codefendants' statements diverged, however, as to their state of mind as they committed the fatal stabbings. Thomas confessed to a premeditated plan to murder one of the victims, while Lee's confession claimed that Thomas had been provoked by the victim's behavior and simply snapped the night of the murders. Neither defendant testified at trial, and the court expressly used Thomas' confession as substantive evidence against Lee.

The Supreme Court held that Lee's conviction must be reversed and a new trial granted because the trial court erred in relying on Thomas' confession as substantive evidence against Lee on the element of premeditation. Under the facts of the case, there was insufficient indicia of reliability, particularly since Thomas had initially refused to talk to police and only gave his statement after police told him Lee had confessed and was urging him to "share the blame."

Ford relies heavily on *Lee* and *Cruz* to support the contention that his trial should have been severed from that of his codefendant and that his trial counsel's failure to move for severance constitutes ineffective assistance of counsel. Ford did not raise the severance issue in his direct appeal from the conviction. He now claims that his appellate counsel, by failing to raise the issue, deprived Ford of effective assistance of appellate counsel.

Our review of the denial of the post-conviction petition is limited to a consideration of trial errors so profound as to result in a substantial denial of the petitioner's constitutional rights. (*E.g., People v. Cobb* (1986), 150 Ill. App. 3d 267, 501 N.E.2d 699, *appeal denied* (1987), 113 Ill. 2d 578, 505 N.E.2d 356.) This court must therefore determine whether the decision not to move for severance should be deemed ineffective assistance of counsel under the standard of *Strickland v. Washington* (1984), 466 U.S. 668, 687, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064.

■ *Strickland* holds that a lawyer's representation of a defendant is not deemed to violate constitutional safeguards unless the lawyer's performance fell below an objective standard of reasonableness and so prejudiced the defense of the case that defendant was denied a fair trial. Defendant must rebut the presumption of competent representation by first establishing that his attorney's performance fell below the standard of objective reasonableness; if he cannot do so, the court need not reach the issue of prejudice. (*People v. Albanese* (1984), 104 Ill. 2d 504, 473 N.E.2d 1246, *cert. denied* (1985), 471 U.S. 1044, 85 L. Ed. 2d 335, 105 S. Ct. 2061.) Furthermore, the defendant is held to the standard of demonstrating, "not simply a possibility of prejudice, but that the claimed error worked to his actual and substantial disadvantage." *People v. Owens* (1989), 129 Ill. 2d 303, 318, 544 N.E.2d 276, 282, *cert. denied* (1990), 497 U.S. 1032, 111 L. Ed. 2d 802, 110 S. Ct. 3294.

In the pending case, Ford must establish that his trial attorney's failure to move for a severance cannot be justified under the objective reasonableness standard. Ford also must prove that had

his attorney successfully moved for severance Ford likely would not have been convicted of first degree murder. This is not an easy burden.

■ As the State points out, at the time of Ford's trial, the law permitted the use of interlocking statements in joint trials, as long as the jury was instructed to consider the statements only against their maker. (See, *e.g.*, *Parker v. Randolph* (1979), 442 U.S. 62, 60 L. Ed. 2d 713, 99 S. Ct. 2132; *People v. Gibons* (1986), 149 Ill. App. 3d 37, 500 N.E.2d 517, *appeal denied* (1987), 113 Ill. 2d 579, 505 N.E.2d 357.) We do not believe that it is objectively reasonable to expect lawyers to anticipate future developments of existing law. (See *Smith v. Murray* (1986), 477 U.S. 527, 91 L. Ed. 2d 434, 106 S. Ct. 2661.) Moreover, the Supreme Court in *Cruz* specifically noted that the admission of a codefendant's confession in a joint trial may be deemed harmless error. (*Cruz*, 481 U.S. at 194, 95 L. Ed. 2d at 172, 107 S. Ct. at 1718.) In the pending case, the State had two voluntary confessions and a credible eyewitness. The defendants acknowledged their shared blame for the death of the victim. Therefore, even assuming that defense counsel's failure to request a severance in the pending action was objectively unreasonable, we do not believe Ford has established the second element of the *Strickland* test, that of material prejudice.

The evidence against Ford in this case was overwhelming. In addition to his own written, signed confession, a key witness testified for the State as to the role of Ford in the slaying. Krystal Warren, the victim's former girlfriend, testified that she had been in the company of Clemons and Ford during the events that led to the stabbing. Before Warren and Clemons met up with Ford, the victim and Clemons had become involved in an altercation at Warren's apartment. Later, Clemons introduced Warren to Ford at a liquor store. Clemons and Warren saw Ford again, later in the evening, aboard a bus. Clemons told Ford that the victim had hit a mutual friend in the face earlier in the evening. Warren testified that Ford displayed a black-handled knife with a five-inch blade while they were on the bus, and kept opening and closing it.

The witness testified that she, Clemons, and Ford left the bus and walked around her neighborhood for awhile. Then Clemons suggested that they go to his cousin's house at an address on West Hastings. According to Warren, the victim was dating a girl who lived in the same apartment building. When Ford, Warren, and Clemons arrived at the building, the victim pushed open the door and took a step toward Clemons. According to Warren, the victim's

hands were at his side. Clemons punched him in the jaw and then grabbed his legs, throwing him to the ground. At that point, Warren went into the lobby of the building and turned to watch the three men outside. Ford was swinging his knife while Clemons held down the victim. Warren saw Ford make stabbing movements with the knife while Clemons prevented the victim from escaping. The victim finally managed to break away and run, with Clemons and Ford in pursuit. Warren testified that when the two men returned to the apartment building, they were laughing and Ford wiped the blood off of his knife with the victim's hat.

Warren repeated some of the codefendants' statements on the witness stand. According to her, Clemons told Ford he could have stabbed Clemons, and Ford said, "No, I wasn't going to stab you because I was looking what I was doing." Also, Ford told Clemons that he, Ford, "already had [his] knife out, when [he] saw the victim come out of the building."

While Ford argued that he believed his acts were necessary to defend himself and his friend, the evidence at trial does not bear that out. Warren testified that Clemons landed the first punch, then grabbed the victim and held him down while Ford stabbed him. When he broke free, the defendants chased him. Ford admitted cutting the victim, but claimed the stabbing was in response to a perceived threat to Clemons. Even so, both defendants admitted that they did not see a weapon in the victim's hands. The scenario thus described is the mortal stabbing of an unarmed man by one defendant while the other pinned the victim down, plus a subsequent chase after the victim.

Under these facts it is difficult to believe that Ford would have been acquitted of murder or convicted of voluntary manslaughter even in a separate trial in which the court barred Clemons' comments about Ford's desire for knife practice. Ford admitted that he wielded the knife, but claimed at trial that he did so only because he thought the victim was hurting Clemons. So he, Ford, swung the knife to keep the victim away. Had he intended to merely wave the knife around as a deterrent, however, it is unlikely that he would plunge it into the victim's chest with enough force to pierce the victim's lung and heart. Forensic evidence produced at trial described such a wound as the cause of death. The evidence further showed the presence of small incised wounds on the victim's fingers, which are indicative of defensive wounds. This suggests that Ford swung the knife at least once before inflicting the deeper wound to the heart and lung.

We reject Ford's contention that the admission of Clemons' statement in the joint trial severely prejudiced his defense by suggesting that Ford acted with premeditation. The intent requirement of first degree murder does not require a well-thought-out plan in advance of the killing; rather, all that is necessary is that the fatal act be accompanied by a contemporaneous intent to kill or knowledge that one's actions are likely to result in great bodily harm or death. Accordingly, we hold that Ford's assertion of ineffective assistance of trial counsel fails under the *Strickland* standard and the trial court properly dismissed the post-conviction petition on that basis.

B

■ We reach a similar result on the second assertion of ineffective assistance of trial counsel—failure of the defense attorney to move to quash Ford's arrest and suppress his confession. The confession contained exculpatory statements as to his mental state. As a trial tactic, moving to suppress a statement containing exculpatory matters might be viewed as counterproductive, especially given the expected testimony of Krystal Warren, whose eyewitness account was particularly damning. In fact, given the strength of the State's case, Ford's only hope for presenting a mitigating mental state was to use his own statements from the confession and to testify at trial regarding his mental state at the time of the stabbing. If the confession had been suppressed and Ford then testified at trial, the State could have used his confession in impeachment. If he declined to testify, Warren's testimony would have provided overwhelming and unrebutted evidence of his role in the slaying. For these reasons, defense counsel clearly did not fall below the standard of objective reasonableness in electing not to challenge the admissibility of his client's statements to the police.

Moreover, we are far from persuaded that a motion to quash the arrest and suppress the confession would have been successful, given the circumstances. Ford argues in his petition that the police acted improperly in effecting a warrantless arrest at his home. (*Payton v. New York* (1980), 445 U.S. 573, 63 L. Ed. 2d 639, 100 S. Ct. 1371.) The facts, however, do not support the assertion that the police violated *Payton* in effecting Ford's arrest. When the police arrived at Warren's house to interrogate her, Clemons was present. He and Warren accompanied the police to the station for interviews. The police first spoke to Warren, then to Clemons, who admitted that he and Ford had stabbed the victim. Clemons further

agreed to accompany the police to an address where Ford could be located. According to the record, the address where Ford was found was not his home address. In any event, the police arrested Ford when he came out onto the porch in response to Clemons' entreaties. After his arrest, Ford gave police a statement, consistent with his trial testimony, in which he attempted to show that the stabbing was in response to the victim's attack on Clemons.

Ford does not assert that the police lacked probable cause for his arrest, but instead argues that his warrantless arrest was tainted by police deception. We agree with the State, however, that the officers' use of Clemons to aid them in securing a peaceful arrest does not constitute the type of deceptive or coercive conduct that might taint the warrantless arrest of a person in his home. Ford was a suspect in a violent homicide and the murder weapon had not been found at the crime scene. The police reasonably believed that Ford was armed and dangerous and might have material evidence in his possession. Ford might have fled the jurisdiction. If the *Payton* rule against warrantless arrests in suspects' homes even applies in this case, we believe that exigent circumstances were present when the police made the arrest. See, *e.g., People v. Abney* (1980), 81 Ill. 2d 159, 407 N.E.2d 543.

We conclude that Ford's assertions of ineffective assistance of trial counsel lack merit. The defense strategy was to minimize the severity of the offense, not deny its occurrence. The State had compelling evidence of Ford's guilt apart from his confession and that of his codefendant.

## II

Since we have held that trial counsel's acts or omissions did not constitute ineffective assistance of counsel, it follows that appellate counsel cannot be found incompetent for failing to assert trial counsel's incompetence. The record indicates that appellate counsel raised several issues on direct appeal, including a challenge to the court's refusal to instruct the jury regarding voluntary and involuntary manslaughter and a challenge to the admission of rebuttal testimony tending to show that defendant had admitted a prior, unprovoked stabbing. These and two other issues on appeal were rejected as unpersuasive. This, then, is not a case in which appellate counsel can be faulted for overlooking substantial trial errors that could be viewed as contributing substantially to the conviction. Rather, the claim of ineffective assistance of appellate counsel is wholly derived from the challenge to the trial attorney's defensive strategies.

220

Under the *Strickland* standard, which applies to review of appellate counsel's representation also (*People v. Caballero* (1989), 126 Ill. 2d 248, 533 N.E.2d 1089), Ford must establish that his appellate lawyer's failure to raise a particular issue was objectively unreasonable and, but for this failure, the conviction or sentence would likely have been reversed. This he cannot do.

For the foregoing reasons, we affirm the trial court's dismissal of Ford's post-conviction petition.

Affirmed.

JIGANTI, P.J., and JOHNSON, J., concur.