STATE of Delaware

v.

Jose RODRIGUEZ, Defendant.

Crim. A. Nos. IN93–02–1208, IN93–02–1209, IN93–02–1211, IN93–02–1212, IN93–02–1214, IN93–02–1216 to IN93–02–1219.

Superior Court of Delaware,
New Castle County.

Submitted: Nov. 5, 1993.

Initially Decided: Nov. 29, 1993.

Supplemented After Remand:
Dec. 29, 1994.

Stephen M. Walther, Asst. State Prosecutor, and Peggy J. Hageman, Deputy Atty. Gen., Wilmington, for the State.

Joseph A. Gabay and Joseph M. Bernstein, Wilmington, for defendant.

## OPINION

BARRON, Judge.

This case raises an issue of first impression in Delaware: Whether a defendant who was convicted of felony murder under 11 *Del.C.* § 636(a)6 [1] may be sentenced to death when circumstantial evidence placed him at the scene of the murder with a gun in his hand, but no evidence existed which demonstrated beyond a reasonable doubt that he fired the fatal shots or expected that violence would erupt in the course of an attempted robbery during which a death occurred. The facts are these:

Three men drove down from Philadelphia, Pennsylvania, to Wilmington, Delaware, on the evening of October 19, 1991, for the specific purpose of robbing the Grape 'N Grain Liquor Store located at the corner of 7th and Union Streets. These men were Angel Carabello, James Perez and the defendant, Jose Rodriguez.[2] The evidence presented at the trial which commenced on October 13, 1993, showed beyond a reasonable doubt that Rodriguez was outside of the liquor store before the attempted robbery/murder wearing a Raiders jacket. He had been positively identified by Al DiBiaso, who had gone to the Grape 'N Grain Liquor Store to buy some beer. Another eyewitness, Kenneth Revell, heard several shots, immediately looked in the direction from which the sound of the shots came and saw two men running from the liquor store, the first wearing a Raiders jacket and holding in his right hand what appeared to be a handgun. Inside of the store, Dinendra Jariwala lay bleeding to death on the floor, his body riddled with six bullet holes.[3]

Two other witnesses observed two Hispanic males running from the direction of the Grape 'N Grain Liquor Store. Robert DiGacomo described one of the males whom he observed running past him to be wearing a black or dark three-quarter length coat. James Showacre testified he saw one of them jump into the left rear door on the driver's side of the getaway vehicle. This individual was wearing a black team jacket. The other individual got into the car through the right front passenger door. He saw this individual, who was wearing a white hooded jacket, toss a chrome object which appeared to be a gun into the front seat passenger area before climbing in. Mr. Showacre's testimony is important because it creates a clear inference

---

1. Eleven *Del.C.* § 636(a)6 states in pertinent part that:

    (a) A person is guilty of murder in the first degree when:

    \* \* \* \* \* \*

    (6) He, with criminal negligence, causes the death of another person in the course of and in furtherance of the commission or attempted commission of ... robbery in the first degree, ... or immediate flight therefrom.

2. James Perez was tried separately for his part in the October 19, 1991, attempted robbery/murder of Dinendra Jariwala. On April 26, 1993, James Perez was convicted following a trial by jury of intentional murder under 11 *Del.C.* § 636(a)1, felony murder under 11 *Del.C.* § 636(a)6, attempted robbery in the first degree, robbery in the first degree, possession of a deadly weapon during the commission of a felony (4 counts), conspiracy in the first degree (2 counts), and conspiracy in the second degree (2 counts), the charges stemming from the October 19, 1991, incident as well as from an October 17, 1991, robbery at Tony's Liquors. On June 8, 1993,

Judge Vincent A. Bifferato sentenced Perez on the murder convictions to two life sentences without benefit of probation or parole, plus 38 years of incarceration on the other convictions. He did so after the jury, following the penalty hearing, recommended by a ten to two vote that a life sentence be imposed.

On November 24, 1993, Angel Carabello pleaded *nolo contendere* under an agreement reached with the State to attempted robbery in the first degree, robbery in the first degree (2 counts), possession of a deadly weapon during the commission of a felony (2 counts), and to several unrelated drug offenses. He was sentenced immediately to 50 years of incarceration suspended after 10 years for 40 years of probation.

3. Dr. Inguito, the Deputy Chief Medical Examiner, testified that the cause of death was "massive internal and external bleeding due to multiple gunshot wounds to the face and body." FBI Special Agent Murphy testified that the shell casings and the recovered projectiles were all fired from the same gun, that being a .25 calibre semiautomatic pistol.

that each robber was armed with a gun during the attempted robbery/murder.

Witnesses described the getaway vehicle, which was subsequently traced to Elizabeth Rodriguez in Philadelphia. She indicated that the car had been given to her by her boyfriend, Angel Carabello. She admitted loaning her car to her brother, the defendant, on several occasions. Rodriguez was arrested on November 3, 1991, shortly after a robbery of a Wawa Food Market in Upper Chichester, Pennsylvania. The Wilmington police were notified, and they responded to the police station in Marcus Hook, Pennsylvania, on November 4, 1991. They gave Rodriguez his *Miranda*[4] warnings, and he was willing to talk. In this statement, Rodriguez clearly implicated himself in the Grape 'N Grain attempted robbery/murder by stating that he had been the getaway driver.[5] On November 20, 1991, Rodriguez gave a second statement, this time denying any involvement in the attempted robbery/murder.

In an effort to prove, *inter alia*, the defendant's intent to murder, the State was allowed to present evidence of prior crimes under Delaware Rule of Evidence (DRE) 404(b) and *Getz v. State*, Del.Supr., 538 A.2d 726 (1988). Specifically, the State introduced evidence of an October 12, 1991, robbery at Klingmeyer's Liquor Store and an October 17, 1991, robbery at Tony's Liquor Store.[6] Jose Rodriguez was positively identified as being one of the two robbers in the Klingmeyer's Liquor Store robbery. During the course of this robbery, Rodriguez held a sawed-off shotgun to the head of Steven Beheler and told his victim, "You're going to die."

In his November 4, 1991, statement, Rodriguez admitted being the getaway driver for the Tony's Liquor Store robbery. The victim of the Tony's Liquor Store robbery, Elio Margiotta, testified that one of the robbers, a thin, young Hispanic male (James Perez) robbed him of his Seiko watch. The watch had a cracked crystal. When the police interviewed Rodriguez on November 4, 1991, they noticed on his wrist a Seiko watch with a cracked crystal. The watch was later identified by Mr. Margiotta and returned to him.

It is clear that all of the above-mentioned evidence failed to convince the jury of Rodriguez's intent to murder, for on October 30, 1993, they returned a verdict of not guilty on the intentional murder charge. As stated, the jury convicted Rodriguez of, *inter alia*, felony murder.[7] In connection with the

---

4. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

5. He stated that "Viejo" and "Mano" were the actual robbers. "Viejo" was a nickname used on occasion in referring to Angel Carabello. "Mano" was a nickname used by Manuel Burgos. No evidence was adduced pointing to any involvement on the part of Manuel Burgos. A latent fingerprint matching a known fingerprint of Angel Carabello was recovered from, *inter alia*, the driver's side, front, of the getaway vehicle. Additionally, James Showacre saw the driver as the getaway vehicle was leaving the scene of the attempted robbery/murder and gave a description which generally matched that of Angel Carabello.

6. The robbery charges and related offenses were contained in the indictment at Counts X through XV. The defendant had sought to sever these charges. The Court denied this severance motion, finding that the offenses charged were of the same general nature, involved a similar course of conduct and occurred within a relatively brief time span. *See State v. Ellis*, Del.Super., 375 A.2d 473 (1977); *Younger v. State*, Del.Supr., 496 A.2d 546 (1985). Reciprocal admissibility was a factor which the Court considered in deny-

ing the severance motion. *See Skinner v. State*, Del.Supr., 575 A.2d 1108 (1990).

7. Rodriguez was also convicted of attempted robbery in the first degree, robbery in the first degree (2 counts), possession of a deadly weapon during the commission of a felony (4 counts), conspiracy in the first degree, and conspiracy in the second degree (3 counts). At sentencing, the Court, pursuant to its reading of 11 *Del.C.* § 521(a) merged the Conspiracy in the first degree count relating to the conspiracy to commit felony murder with the Conspiracy in the second degree count relating to the conspiracy to commit the attempted robbery of Mr. Jariwala at the Grape 'N Grain Liquor Store. Subsection 521(a) states that if a person conspired to commit a number of crimes, he is guilty of only one conspiracy, so long as the multiple counts are the object of the same agreement. He may be convicted of the degree of conspiracy which includes the most serious offense which he is found guilty of conspiring to commit. The Court therefore sentenced the defendant on the one charge of Conspiracy in the first degree. *See Alston v. State*, Del.Supr., 554 A.2d 304 (1989), *cert. denied* 490 U.S. 1101 (1989) (a person who commits several crimes is nonetheless guilty of only one

charges relating to the Grape 'N Grain incident, the Court gave the jury an accomplice liability instruction [8] and further instructed the jury that "... should you return a verdict of guilty, your verdict need not be unanimous as to a specific theory of liability as a principal or as an accomplice so long as you are all in general agreement as to his guilt." [9]

Although it is not known for certain, it may be inferred that since the jury acquitted the defendant on the intentional murder charge, his conviction on the felony murder charge was based upon his accomplice status. The cases of *Enmund v. Florida*, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982) and *Tison v. Arizona*, 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987) are clearly implicated.

## THE ENMUND/TISON STANDARD

■ In *Enmund v. Florida, supra*, the United States Supreme Court held that the Eighth and Fourteenth Amendments to the United States Constitution were violated by the imposition of the death penalty on a person who aided and abetted a felony in the course of which a murder was committed by others but who did not himself kill, attempt to kill, intend to kill, or contemplate that life would be taken.

In *Tison v. Arizona, supra*, the Supreme Court distinguished its earlier holding in *Enmund* by holding that the Eighth Amendment does not prohibit the death penalty as disproportionate in a case of a defendant whose participation in the felony that results in a murder was major and whose mental state was one of reckless indifference to human life.

The *Enmund/Tison* standard was succinctly delineated in *Jackson v. State*, Fla.Supr., 575 So.2d 181 (1991) as follows:

It is well settled that a fundamental requirement of the eighth amendment of the United States Constitution is that the death penalty must be proportional to the culpability of the defendant. In *Enmund*, the United States Supreme Court, "citing the weight of legislative and community opinion, found a broad societal consensus, with which it agreed, that the death penalty was disproportional to the crime of robbery-felony murder" under the circumstances of that case. *Tison*, 481 U.S. at 147, 107 S.Ct. at 1682; *cf. Coker v. Georgia*, 433 U.S. 584, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977) (holding the death penalty disproportional to the crime of rape). Individualized culpability is key, and "[a] critical facet of the individualized determination of culpability required in capital cases is the mental state with which the

---

conspiracy as long as the multiple crimes are the object of the same agreement).

The defendant appealed to the Delaware Supreme Court his Conspiracy in the first degree conviction and sentence. The defendant argued that the predicate felony of criminally negligent homicide implied an unintended criminal result and, since it is logically impossible to agree in advance to an unintended result, he could not be convicted of Conspiracy in the first degree. The Delaware Supreme Court agreed and, after vacating the sentence regarding the conspiracy in the first degree charge, remanded the case back to this Court for sentencing on the previously merged Conspiracy in the second degree charge. *Rodriguez v. State*, Del.Supr., No. 466, 1993, 1994 WL 679731, Walsh, J. (Nov. 29, 1994) (ORDER) (one cannot commit a conspiracy to commit a crime which is defined in terms of reckless or negligent conduct). Rodriguez did not appeal from his convictions and sentences regarding the remaining charges. The Supreme Court's Mandate was issued on December 19, 1994. On December 20, 1994, at an office conference, the State entered a *nolle prosequi* on the conspiracy

in the second degree charge. This came as no surprise to the Court, since disregarding both the vacated conspiracy in the first degree sentence and the now dropped conspiracy in the second degree charge, the defendant must still serve, consecutive to his Pennsylvanic sentence of from 5 to 20 years of incarceration, a sentence of life incarceration without the benefit of parole or any other sentence reductions, plus an additional 144 years, 80 of which are minimum mandatory periods of incarceration. On December 21, 1994, the Court issued an amended sentencing order reflecting the above.

8. *See* 11 *Del.C.* § 271. Delaware's statutory accomplice liability law has abandoned the common law distinctions between principals and accessories. *Morrisey v. State*, Del.Supr., 620 A.2d 207, 211 (1993).

9. A general unanimity instruction is proper under the facts of this case. *See Liu v. State*, Del.Supr., 628 A.2d 1376 (1993); *Pope v. State*, Del.Supr., 632 A.2d 73 (1993). *Compare Probst v. State*, Del.Supr., 547 A.2d 114 (1988).

defendant commits the crime." *Tison*, 481 U.S. at 156, 107 S.Ct. at 1687. Hence, if the state has been unable to prove beyond a reasonable doubt that a defendant's mental state was sufficiently culpable to warrant the death penalty, death would be disproportional punishment. *See generally id.*, *Enmund*, 458 U.S. at 782, 102 S.Ct. at 3369.

In *Enmund* and *Tison*, the Court said that the death penalty is disproportional punishment for the crime of felony murder where the defendant was merely a minor participant in the crime and the state's evidence of mental state did not prove beyond a reasonable doubt that the defendant actually killed, intended to kill, or attempted to kill. Mere participation in a robbery that resulted in murder is not enough culpability to warrant the death penalty, even if the defendant anticipated that lethal force might be used, because "the possibility of bloodshed is inherent in the commission of any violent felony and this possibility is generally foreseeable and foreseen." *Tison*, 481 U.S. at 151, 107 S.Ct. at 1684. However, the death penalty may be proportional punishment if the evidence shows both that the defendant was a major participant in the crime, and that the defendant's state of mind amounted to reckless indifference to human life. As the Court said, "we simply hold that major participation in the felony committed, combined with reckless indifference to human life, is sufficient to satisfy the *Enmund* culpability requirement." *Tison*, 481 U.S. at 158, 107 S.Ct. at 1688. Courts may consider a defendant's "major participation" in a crime as a factor in determining whether the culpable state of mind existed. However, such participation alone may not be enough to establish the requisite culpable state of mind. *Id.*, 481 U.S. at 158 n. 12, 107 S.Ct. at 1688 n. 12. *Id.* at 190–91.

In *Cabana v. Bullock*, 474 U.S. 376, 106 S.Ct. 689, 88 L.Ed.2d 704 (1986), the Supreme Court indicated that it did not wish to impose upon the States a hard and fast rule as to when the *Enmund* finding must be made and who must make it.[10] The Court suggested that such a finding could be made either by the jury, the trial court or the state appeals court.[11]

There is a certain appeal in leaving to the Delaware Supreme Court the determination of whether the *Enmund/Tison* standard has been met. After all, it is the cautious admonition of *Enmund* and *Tison* that the United States Constitution requires proof of culpability great enough to render the death penalty proportional punishment. And, under Delaware's capital punishment statute, it is left for the Delaware Supreme Court to determine whether a sentence of death is "disproportionate to the penalty ... imposed in similar cases...." 11 *Del.C.* § 4209(g)(2)a.;

---

**10.** "... [T]o the extent that *Enmund* recognizes that a defendant has a right not to face the death penalty absent a particular factual predicate, it also implies that the State's judicial process leading to the imposition of the death penalty must at *some* point provide for a finding of that factual predicate." *Cabana v. Bullock*, 474 U.S. at 390–91, 106 S.Ct. at 699. (Emphasis in original.)

**11.** When the *Cabana* decision was issued, *Tison* had not yet been decided. It is clear, however, that *Tison* did not alter the Court's preference for allowing the state courts an opportunity to carry out in the first instance the factual inquiry necessary to sustain a sentence of death. In fact, the *Tison* Court cited *Cabana* in remanding the case back to the Arizona Supreme Court so that the Arizona courts could determine whether the Tison brothers acted with a reckless indifference to human life. *Tison v. Arizona*, 481 U.S. at 158, 107 S.Ct. at 1688. In turn, the Arizona Supreme Court remanded the case back to the Arizona

Superior Court to make the *Enmund/Tison* findings. The trial court did so and resentenced both Tison brothers to death without holding an evidentiary hearing. The Tison brothers appealed to the Arizona Supreme Court which remanded for the purpose of holding such a hearing. *See State v. Tison*, 160 Ariz. 501, 774 P.2d 805 (1989).

At this point, the trail of Ricky and Raymond Tison disappears from the Pacific Reporter, Second Series. This Court learned of their eventual fate from the Honorable H. Stewart Bradshaw, Presiding Judge of the Superior Court of Yuma County, Arizona, who provided the following information: After the second remand from the Arizona Supreme Court, the trial judge recused himself. The case was transferred to a Maricopa County Superior Court judge, who eventually resentenced both Tison brothers to life imprisonment. Their co-defendant, Randy Greenawalt, remains on death row and is currently seeking postconviction relief.

*see Red Dog v. State,* Del.Supr., 616 A.2d 298 (1992); *Pennell v. State,* Del.Supr., 604 A.2d 1368 (1992).

On the other hand, Delaware jurisprudence has a long tradition under which factual determinations initially have been made at the trial court level.[12] The Court, therefore, has decided to confront this issue in the first instance.

Under Delaware's capital murder sentencing statute, the jury gives to the Court its sentencing recommendation by providing answers to the following two questions:

> (i) Whether the evidence shows beyond a reasonable doubt the existence of at least one aggravating circumstance as enumerated in subsection (e) of this section; and

> (ii) Whether, by a preponderance of the evidence, after weighing all relevant evidence in aggravation or mitigation which bears upon the particular circumstances or details of the commission of the offense and the character and propensities of the offender, the aggravating circumstances found to exist outweigh the mitigating circumstances found to exist.

11 *Del.C.* § 4209(c)(3).

The responses need not be unanimous. Here, the Court informed the jury that its sentencing recommendation would be accorded "great weight." In this spirit, the Court determined that the jury's input on the *Enmund/Tison* standard would be meaningful and persuasive. The Court, accordingly, charged the jury, in pertinent part, as follows:

> A sentencing consideration which is necessary for you to decide in this case is the extent of the defendant's actual involvement in the attempted robbery/murder of

Dinendra Jariwala. This is so because the reckless disregard for human life implicit in knowingly engaging in criminal activities known to carry a grave risk of death represents a highly culpable mental state, a mental state that may be taken into account in making a capital sentencing judgment when the conduct causes its natural, though not inevitable, lethal result. In light of this, the interrogatory also contains the following two questions:

> 1. Do you find beyond a reasonable doubt that the defendant was a major participant in the attempted robbery/murder of Dinendra Jariwala?

> The defendant may be said to be a major participant in the attempted robbery/murder if he was actively involved in every element of the attempted robbery and was physically present during the entire sequence of criminal activity culminating in the murder of Dinendra Jariwala. The defendant may not be said to be a major participant in the attempted robbery if he was merely sitting in a car away from the actual scene of the murder acting as the getaway driver to the attempted robbery.

> 2. Do you find beyond a reasonable doubt that the defendant's actions in connection with the death of Dinendra Jariwala demonstrated a reckless indifference to human life?

> In this connection, I instruct you that a person acts recklessly with respect to death when he is aware of and consciously disregards a substantial and unjustifiable risk that death will result from his conduct. The risk must be of such a nature and degree that disregard thereof constitutes a

---

12. *See* Supr.Ct.R. 8; *Jenkins v. State,* Del.Supr., 305 A.2d 610 (1973) (contentions not fairly presented to the trial court for decision will generally not be reviewed on appeal); *Johnson v. State,* Del.Supr., 409 A.2d 1043 (1979) (defendant could not be convicted of conspiracy as an accomplice where that issue was not determined at trial court level); *Gaines v. State,* Del.Supr., 571 A.2d 765 (1990) (claim that amount of restitution was improperly calculated may not be raised for first time on appeal). Other States have specifically required that the trial court make the finding that a capital murder defendant is death qualified. *See State v. McDaniel,* 136 Ariz. 188,

665 P.2d 70 (1983) (to ensure compliance with *Enmund,* in future cases where the jury might have found the defendant guilty of first degree murder based on felony murder theory, trial judge must determine beyond a reasonable doubt prior to imposing a sentence of death that the defendant killed, attempted to kill or intended to kill); *State v. Gillies,* 135 Ariz. 500, 662 P.2d 1007 (1983) (to comply with *Enmund,* trial court must find that a defendant killed, attempted to kill, or intended to kill the victim of first degree murder before it can impose a sentence of death).

gross deviation from the standard of conduct that a reasonable person would observe in the situation.

To each of the two *Enmund/Tison* questions, the jury responded with nine affirmative votes and three negative votes.[13] Stated differently, twenty-five percent of the jury could not find beyond a reasonable doubt either that Rodriguez was a major participant or that he demonstrated a reckless indifference to human life.

With the jury's recommendation in mind, a factual review of *Enmund* and *Tison* as well as cases from other jurisdictions which address this issue is warranted.

In *Enmund v. Florida, supra,* the defendant was merely the getaway driver who was not present at the scene of the murder. The Supreme Court held that he could not be sentenced to death for his felony murder conviction since he did not himself kill, attempt to kill, intend to kill or intend that lethal force be used.

In *Tison v. Arizona, supra,* the defendants were Ricky and Raymond Tison, sons of convicted killer and Arizona State Prison inmate Gary Tison. Ricky and Raymond executed a bold prison break. They entered the prison with a chest filled with guns and after arming their father and his cellmate, Randy Greenawalt, also a convicted killer, the four broke out of prison. After their getaway vehicle broke down in the desert, they flagged down a passing motorist. The driver, his wife, their two-year-old son and fifteen-year-old niece were inside the car. After being robbed and kidnapped and seeing the display of weapons, the driver begged the assailants for his and his passengers' lives. With Ricky and Raymond observing, Gary Tison and Randy Greenawalt walked over to the captives and repeatedly fired shotgun blasts into them, killing all four. Several days later, Ricky and Raymond Tison and Randy Greenawalt were captured after a shootout at a police roadblock. They were tried together and sentenced to death. Gary

Tison escaped into the desert where he later died of exposure.

The Supreme Court noted the following in assessing the defendants' mental culpability:

Raymond Tison brought an arsenal of lethal weapons into the Arizona State Prison which he then handed over to two convicted murderers, one of whom he knew had killed a prison guard in the course of a previous escape attempt. By his own admission he was prepared to kill in furtherance of the prison break. He performed the crucial role of flagging down a passing car occupied by an innocent family whose fate was then entrusted to the known killers he had previously armed. He robbed these people at their direction and then guarded the victims at gunpoint while they considered what next to do. He stood by and watched the killing, making no effort to assist the victims before, during, or after the shooting. Instead, he chose to assist the killers in their continuing criminal endeavors, ending in a gun battle with the police in the final showdown.

Ricky Tison's behavior differs in slight details only. Like Raymond, he intentionally brought the guns into the prison to arm the murderers. He could have foreseen that lethal force might be used, particularly since he knew that his father's previous escape attempt had resulted in murder. He, too, participated fully in the kidnapping and robbery and watched the killing after which he chose to aid those whom he had placed in the position to kill rather than their victims.

*Id.* 481 U.S. at 151–52, 107 S.Ct. at 1685.

The Supreme Court determined that "These facts not only indicate that the Tison brothers' participation in the crime was anything but minor, they also would clearly support a finding that they both subjectively appreciated that their acts were likely to result in the taking of innocent life." *Id.* at 152, 107 S.Ct. at 1685.

---

**13.** Because Delaware's capital murder sentencing statute envisions the jury's role as being advisory in nature, the Court rejected the notion of requiring jury unanimity with regard to the two *Enmund/Tison* questions. In other words, the Court concluded that it should make the final determination on the *Enmund/Tison* issue, after considering the jury's recommendations with regard thereto.

In *Diaz v. State*, Fla.Supr., 513 So.2d 1045 (1987), *cert. denied*, 484 U.S. 1079, 108 S.Ct. 1061, 98 L.Ed.2d 1022 (1988), the Florida Supreme Court held that the *Enmund/Tison* standard had been met where the defendant was one of three men accused of murdering a bar manager during the course of a robbery. Diaz was identified by a witness as the triggerman. Further, the evidence showed that he "and his fellow robbers each discharged a gun during the robbery. There is evidence that Diaz's gun had a silencer. Eight to twelve persons occupied the bar at the time of the robbery." *Id.* at 1048. The Florida Supreme Court concluded that the *Enmund/Tison* standard had been satisfied since the evidence proved beyond a reasonable doubt that "Diaz was a major participant in the felonies and at the very least was recklessly indifferent to human life." *Id.*

The Florida Supreme Court also found that the *Enmund/Tison* standard had been met in *DuBoise v. State*, Fla.Supr., 520 So.2d 260 (1988) (on rehearing). The Court reasoned:

> DuBoise and his two companions decided to grab a woman's purse in order to get some money. As they passed the victim on the street, DuBoise left their car and attempted to snatch her purse. When she resisted, the other men came to assist DuBoise. The victim recognized one of DuBoise's companions, and the three men put the victim in the car and drove to another area of town. There, while DuBoise raped her, the man whom the victim had recognized struck her with a piece of lumber. DuBoise's companions then raped the woman and both struck her with pieces of lumber.
>
> DuBoise was a major participant in the robbery and sexual battery. He made no effort to interfere with his companions' killing the victim. By his conduct during the entire episode, we find that he exhibited the reckless indifference to human life required by *Tison*.

*Id.* at 266.

The Florida Supreme Court overturned a death sentence in *Jackson v. State, supra*, since it concluded that the *Enmund/Tison* standard had not been met. There, two men were seen running through an alley away from a hardware store and jumping into a pickup truck identified as one belonging to the defendant's mother's boyfriend. Inside the store, the victim lay dying on the floor from a gunshot wound. The cash register drawer was open. Police lifted the defendant's brother's palm print off of the back of the cash register. The murder weapon was never recovered. Jackson denied his involvement to the police. Statements were introduced which were made by the defendant to civilian witnesses in which he implicated himself in the robbery/murder. While the Florida Supreme Court found the evidence to be lacking on a premeditated murder theory, it did find that the evidence supported a felony murder theory:

> In *Griffin*, premeditation was supported by evidence that Griffin used a "particularly lethal gun"; the bullets were of a special type designed to have "a high penetrating ability"; there was no sudden provocation caused by the victim; and Griffin fired two shots into his victim at close range. *Griffin [v. State ]*, 474 So.2d [777] at 780 [ (Fla. 1985) ]. Those facts are completely distinguishable from the instant case where there is no evidence to indicate an anticipated killing, and where all of the evidence is equally and reasonably consistent with the theory that Phillibert resisted the robbery, inducing the gunman to fire a single shot reflexively, not from close range, with an unidentified type of weapon and bullet. There is no evidence of a fully-formed conscious purpose to kill. Moreover, there is no evidence in this record that Jackson fired the shot that killed Phillibert.

575 So.2d at 186.

The Court then engaged in the *Enmund/Tison* analysis:

> Although the evidence against Jackson shows that he was a major participant in the crime, it does not show beyond every reasonable doubt that his state of mind was any more culpable than any other armed robber whose murder conviction rests solely upon the theory of felony murder. *See Tison*, 481 U.S. at 150–51, 107 S.Ct. at 1684–85. The entire case is based on circumstantial evidence. The totality of

the record shows that Jackson previously indicated his intent to rob Phillibert's store; that Jackson was seen driving in the vicinity of the store shortly before and after the crime; that Jackson had been driving with his brother, whose fingerprints were found on the cash register; that Jackson said afterward "we had to do it because he had bucked the jack"; and that Jackson asked his mother to tell his brother to say "he hadn't been nowhere around the hardware store and get rid of the gun." A reasonable inference could be drawn from the evidence in this record that either of the two robbers fired the gun, contrary to the finding of the trial judge. There was no evidence presented in this trial to show that Jackson personally possessed or fired a weapon during the robbery, or that he harmed Phillibert. There was no evidence that Jackson carried a weapon or intended to harm anybody when he walked into the store, or that he expected violence to erupt during the robbery. There was no real opportunity for Jackson to prevent the murder since the crime took only seconds to occur, and the sudden, single gunshot was a reflexive reaction to the victim's resistance. No other innocent lives were jeopardized.

*Id.* at 192–93.

The Court concluded that the evidence was insufficient to establish that Jackson's state of mind was culpable enough to rise to the level of reckless indifference to human life such as to warrant the death penalty for felony murder.

A similar case is that of *White v. State,* Miss.Supr., 532 So.2d 1207 (1988). There, evidence placed the defendant at the scene of a robbery/murder with a gun in his hand. The victim, the owner of the cafe which had been robbed, had been shot in the mouth. In performing the necessary *Enmund/Tison* analysis, the Mississippi Supreme Court summed up the evidence as follows:

The evidence is more than sufficient to show beyond a reasonable doubt that White, his brother, L.V. White, and Willie Ruth (Bessie) Anderson robbed Poo–Nannie's Cafe, that its owner, Annie Dale Lewis, was killed in the course of the robbery, and that White was present when the killing occurred. But the evidence concerning the events before and after the robbery offers no indication which robber killed Lewis, or that any of the three contemplated in advance that lethal force would be employed.

More specifically, there is no evidence that White made any attempt to kill Lewis, or that he contemplated that lethal force would be used. Circumstantial evidence places White in the store with his brother and Anderson at the time Lewis was killed. This is enough to undergird the jury verdict that White was guilty of capital murder. Because nothing in the record legitimately suggests that White killed or contemplated any physical harm to Lewis, the death verdict dies.

To be sure, Sam Spearman testified that he saw Willie Lee White leaving the scene with a gun in his hand. There is nothing to show that this gun was the murder weapon, that White handled it before the shooting, or that it had even been fired, or that White knew of the presence of the gun until after the killing. Neither the murder weapon, nor any other gun, was received as evidence at trial. The evidence before the jury is wholly consistent with numerous other scenarios by which Willie White did not kill or anticipate a killing. Other reasonable hypotheses would suggest that L.V. White might have been the killer. Or Willie Ruth Anderson. What is important is that nothing in the record offers the jury a rational basis for selecting one hypothesis over the other. In sum, we have a pure absence of any proof on the elements contained in the sentencing statute.

*Id.* at 1221.

The Court then held that the evidence was legally insufficient to enable a rational trier of fact to find beyond a reasonable doubt that the defendant killed, attempted to kill, intended that a killing take place, or contemplated that lethal force would be employed.

A case similar in its facts to *White v. State, supra,* is that of *Jones v. Thigpen,* 741 F.2d

805 (5th Cir.1984).[14] There, the Court refused to affirm the death sentence imposed on the defendant, stating:

> The record in this case does not tell us what Jones and his accomplices separately or collectively intended to do when they drove to downtown Biloxi in December of 1974. It does not tell us what happened inside Art's Levis Store. It does not specify who supplied or carried the weapon that was used to bludgeon Arthur Weinberger to death, and the weapon itself was not introduced at trial. This record does not tell us whether Jones or his accomplice did the actual killing. The State's case consists only of the testimony of several witnesses who observed Jones and his accomplice entering and departing the store, and the testimony of the witness who discovered Weinberger's body inside the store immediately afterwards. *Enmund* ... undoubtedly, and unfortunately in this case, requires more.

*Id.* at 817.

The Court then, in a footnote, explained the significance of the *Enmund* holding as follows:

> *Enmund,* compels the anomalous result that two can avoid a capital murder ... [death sentence] where one could not. If Jones had been *alone* in this crime, we could, on the evidence against him in this record, uphold a ... [death sentence]. If he had been alone the jury could have reasonably inferred that he took the life of Art Weinberger. From this record we cannot say whether it was he or his accomplice, or both, and thus neither may receive the death sentence. (Emphasis in original.)

*Id.* at 817 n. 1. *See also State v. Emery,* 141 Ariz. 549, 552, 688 P.2d 175, 178 (1984) (no evidence that defendant intended that his co-defendant inflict fatal wounds, so death sentence reduced to life); *People v. Jones,* 94 Ill.2d 275, 68 Ill.Dec. 903, 912, 921, 447 N.E.2d 161, 164, 173 (1982) (nothing in record shows defendant killed, attempted to kill or intended to kill victim, so *Enmund* re-

quires death sentence be vacated); *People v. Tiller,* 94 Ill.2d 303, 68 Ill.Dec. 916, 919–21, 926, 447 N.E.2d 174, 177–79, 184 (1982) (defendant not shown to have planned or participated in killings, so under *Enmund* death sentences must be vacated).

The above-cited cases suggest that *Enmund* and *Tison* are not satisfied in the usual multiple defendant murder case where there are no eyewitnesses and where the evidence is circumstantial and does not clearly identify the actual killer. *Jackson v. State, supra* at 193; *White v. State, supra. But see State v. Robinson,* 165 Ariz. 51, 62, 796 P.2d 853, 864 (1990) (*Enmund/Tison*) did not preclude death penalty for both defendant Robinson and co-defendant Washington where evidence showed defendant, who loaded firearms into his vehicle in preparation for events which followed, was mastermind behind the escapade that ended in murder, and co-defendant was "at least present" when victims were bound by their hands and feet, then terrorized and shot, but no evidence established beyond a reasonable doubt who fired the fatal shots); *State v. McDaniel,* 136 Ariz. 188, 665 P.2d 70 (1983) (death sentence upheld under *Enmund* where defendant participated in the robbery and beating of the victim, helped bind victim's hands and legs in order to lock him in trunk of car where he died of heat exhaustion or suffocation); *Van Poyck v. State,* Fla.Supr., 564 So.2d 1066 (1990) (death sentence upheld under *Tison* analysis where no evidence showed that defendant shot the victim but evidence showed that defendant was instigator of and was identified as primary participant in unsuccessful attempt to free a prisoner and associated fatal shooting of corrections officer, recruited his co-defendant and obtained three guns used in the attempted escape); *Rouster v. State,* Ind.Supr., 600 N.E.2d 1342, 1350 (1992) (death sentence upheld under *Tison* where no one saw the shooting but evidence showed that two guns had been used to kill the victims and witness at time of killings overheard defendant and co-defendant threaten and verbally abuse the victims).

---

**14.** *See also Thigpen v. Jones,* 475 U.S. 1003, 106 S.Ct. 1172, 89 L.Ed.2d 292 (1986), on remand, 788 F.2d 1101 (5th Cir.1986).

The *Enmund/Tison* analysis must be applied on a case-by-case basis. Major participation and reckless indifference to human life are more likely to be found where an accomplice defendant is present at and before a killing which involved considerable deliberation and the killing is preceded by physical or psychological abuse of the victim, including assault, torture or other acts of cruelty. Such a finding is less likely where the killing is sudden or impulsive and it cannot be established either through the testimony of an eyewitness or through other evidence that the defendant actually caused the victim's death. In the case at bar, while there was some evidence that Jose Rodriguez was the triggerman, this evidence was deemed inadmissible.

## THE STATEMENT OF JAMES PEREZ

On November 11, 1991, James Perez gave a statement to the police after receiving his *Miranda* warnings. This statement was made at the Homicide Division of the Philadelphia Police Department. In this statement, Perez admitted being inside the Grape 'N Grain at the time of the October 19, 1991, attempted robbery/murder. He indicated that after the victim grabbed him, he told his partner, Jay (Jose Rodriguez), to "get him." Perez stated that he meant for Rodriguez to punch him. Instead, Perez stated that Rodriguez pulled out his gun, a .25 calibre semiautomatic, and fired several rounds into the victim's body.

Perez had been convicted and sentenced to life imprisonment without the possibility of probation or parole for his part in the Grape 'N Grain attempted robbery/murder prior to the commencement of Rodriguez's trial. The State indicated its desire to introduce Perez's statement at Rodriguez's trial. Perez, however, refused to be sworn as a witness or to give any testimony at Rodriguez's trial, so the Court had no choice but to rule Perez's statement inadmissible.[15]

15. The statement was not admissible under DRE 801(d)(2)(E) because that rule applies only with regard to a statement by a co-conspirator of a party which was made "during the course and in furtherance of the conspiracy...." *Id.* Here, Perez's statement was made to the police after the conspiracy had ended. DRE 801(d)(2)(E) refers to non-custodial statements. *See Bourjaily v. United States*, 483 U.S. 171, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987).

Nor was the statement admissible under DRE 803(24). When a witness is shown to be unavailable, his statement is admissible only if it bears "adequate indicia of reliability." *Idaho v. Wright*, 497 U.S. 805, 815, 110 S.Ct. 3139, 3146, 111 L.Ed.2d 638 (1990). Reliability may be presumed "in a case where the evidence falls within a firmly rooted hearsay exception." *Id.* If the hearsay is not part of a firmly rooted hearsay exception, then "the evidence must be excluded, absent a showing of particularized guarantees of trustworthiness." *Id.* The Court rejected the State's contention that evidence corroborating the truth of the hearsay statement could properly support a finding that the statement bears particularized guarantees of trustworthiness. "To be admissible under the Confrontation Clause, hearsay evidence used to convict a defendant must possess indicia of reliability by virtue of its inherent trustworthiness, not by reference to other evidence at trial." *Id.* at 822, 110 S.Ct. at 3150. The United States Supreme Court in *Wright* held that Idaho's residual hearsay exception, which is identical to DRE 803(24), is not a firmly rooted hearsay exception for Confrontation Clause purposes. *Id.* at 817, 110 S.Ct. at 3147.

Further, the statement was not admissible under DRE 804(b)(3). In *Lee v. Illinois*, 476 U.S. 530, 106 S.Ct. 2056, 90 L.Ed.2d 514 (1986), the Supreme Court stated that "when one person accuses another of a crime under circumstances in which the declarant stands to gain by inculpating another, the accusation is presumptively suspect and must be subjected to the scrutiny of cross-examination." *Id.* at 541, 106 S.Ct. at 2062. *See also Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968); *United States v. Flores*, 985 F.2d 770 (5th Cir.1993); *Walton v. State*, Fla.Supr., 481 So.2d 1197 (1985). Thus, DRE 804(b)(3) cannot here support the admission of Perez's statement. *See United States v. Innamorati*, 996 F.2d 456, 474–75 (1st Cir.1993) (questioning, but finding it unnecessary to decide, whether a statement of a co-defendant who confesses to the police and also inculpates another person even qualifies as a declaration against penal interest). In *Smith v. State*, Del.Supr., 647 A.2d 1083 (1994), the Delaware Supreme Court squarely faced this issue, and, with reliance on *Williamson v. United States*, — U.S. —, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994), held that non-self-incriminating components of a declaration purportedly falling with DRE 804(b)(3) are presumptively inadmissible hearsay because they cannot claim any special guarantees of reliability and trustworthiness. *Smith v. State*, 647 A.2d at 1088. Finally, since 11 *Del.C.* § 3507 is rather unique in evidentiary jurisprudence, it can hardly be argued that this Delaware statute constitutes a firmly rooted hearsay exception. In any event, its use has been carefully circumscribed by the Delaware Supreme Court. *See Keys v. State*,

In arriving at the conclusion reached herein, the Court does not place any reliance upon Perez's statement. First of all, such a statement is deemed to be presumptively suspect and must be subjected to the scrutiny of cross-examination. *See Lee v. Illinois,* 476 U.S. 530, 541, 106 S.Ct. 2056, 2062, 90 L.Ed.2d 514 (1986); *Williamson v. United States,* —— U.S. ——, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994). Because Perez refused to testify, he could not be cross-examined.

More importantly, being deemed inadmissible, Perez's statement does not constitute record evidence. The Court must blind itself to facts not presented in the record of this case. *See Jackson v. State, supra* at 193.

## THE SENTENCING DETERMINATION

Pursuant to 11 *Del.C.* § 4209(b), a capital murder penalty hearing was held commencing November 1, 1993, and ending on November 4, 1993. During this hearing the same jury which had determined the defendant's guilt heard evidence in order for them to recommend the appropriate penalty with regard to the felony murder charge.

At the penalty hearing, the State relied upon the existence of the following two statutory aggravating circumstances and offered evidence in support thereof:

1. The murder was committed while the defendant was engaged in the attempted commission of a robbery. 11 *Del.C.* § 4209(e)(1)j.

2. The murder was committed for pecuniary gain. 11 *Del.C.* § 4209(e)(1)o.

The State also offered evidence regarding the following non-statutory aggravating circumstances:

1. Victim impact.

2. Defendant's prior adjudications and pleas of guilty as a juvenile.

3. Defendant's conviction of robbery arising out of the robbery of the Wawa Food Market in West Goshen, Pennsylvania, on November 3, 1991.

Defendant's conviction of robbery arising out of the robbery of the Wawa Food Market in Upper Chichester, Pennsylvania, on November 3, 1991.

4. Testimony from witnesses regarding the above-referenced convictions.

5. Testimony of Elizabeth Rodriguez regarding defendant's family life.

6. The victim was defenseless.

The defense offered evidence regarding the following mitigating circumstances:

1. Defendant's chronological age at the time of the offense.

2. Defendant's limited intellectual capacity.

3. Defendant's family background.

4. Defendant's history of drug and alcohol abuse.

5. The fact that the defendant was acting under the influence or domination of an older person, namely Angel Carabello.

6. Defendant's potential for rehabilitation.

7. Mercy.

Following presentation of the evidence, arguments were made by counsel. The defendant also gave a statement to the jury, as is permitted by 11 *Del.C.* § 4209(c)(2). During the Court's charge on the law, the Court impressed upon the jury members the solemnity of their task. At one point, the Court observed that "while the Court has the ultimate responsibility for imposing sentence on the defendant, your role as jurors is, nevertheless, extremely important. You will provide the Court, as the conscience of the community, with an advisory opinion on what the jury believes the evidence has shown with regard to the appropriate penalty in this case. Although the Court is not bound by your recommendation, your answers to the two questions provided will be given great weight by the Court in its final determination of the appropriate sentence." At the end of the charge, the Court reminded the jury to give due regard "to the gravity of these

Del.Supr., 337 A.2d 18 (1975); *Gray v. State,* Del.Supr., 441 A.2d 209 (1982); *Ray v. State,*

Del.Supr., 587 A.2d 439 (1991); *Feleke v. State,* Del.Supr., 620 A.2d 222 (1993).

proceedings" and to recognize "that human life is at stake...."

Following more than five hours of deliberation, the jurors unanimously concluded that the State had proven beyond a reasonable doubt the existence of one statutory aggravating circumstance, to wit: The murder had been committed while the defendant was engaged in the attempted commission of robbery in the first degree.[16] By a vote of nine to three, the jury found, by a preponderance of the evidence, after weighing all relevant evidence in aggravation or mitigation which bears upon the particular circumstances or details of the commission of the offense and the character and propensities of the offender, that the aggravating circumstances found to exist outweighed the mitigating circumstances found to exist.

The jury understood the statutory framework under which they had deliberated. Subsection (c)(3) of 11 *Del.C.* § 4209, the contents of which were provided to the jury, states as follows:

(a) Upon the conclusion of the evidence and arguments the judge shall give the jury appropriate instructions and the jury shall retire to deliberate and recommend to the Court an answer to the following questions:

(i) Whether the evidence shows beyond a reasonable doubt the existence of at least one aggravating circumstance as enumerated in subsection (e) of this section; and

(ii) Whether, by a preponderance of the evidence, after weighing all relevant evidence in aggravation or mitigation which bears upon the particular circumstances or details of the commission of the offense and the character and propensities of the offender, the aggravating circumstances found to exist outweigh the mitigating circumstances found to exist.

(b) The jury shall report to the Court its final vote, stating the number of affirmative and negative votes on each question.

11 *Del.C.* § 4209(c)(3).

The law goes on at subsection (d), also provided to the jury, to state as follows:

(d) *Determination of Sentence.* (1) A sentence of death shall be imposed, after considering the recommendation of the jury, if a jury is impaneled, if the Court finds:

a. Beyond a reasonable doubt at least 1 statutory aggravating circumstance; and

b. By a preponderance of the evidence, after weighing all relevant evidence in aggravation or mitigation which bears upon the particular circumstances or details of the commission of the offense and the character and propensities of the offender, that the aggravating circumstances found by the Court to exist outweigh the mitigating circumstances found by the Court to exist.

(2) Otherwise, the Court shall impose a sentence of imprisonment for the remainder of the defendant's natural life without benefit of probation or parole or any other reduction.

Under the Delaware statutory scheme, the Court must first determine whether a statutory aggravating circumstance exists and such finding must be made beyond a reasonable doubt. If the Court finds none, the inquiry is at an end and a natural life sentence must thereafter be imposed. If the Court determines the existence of at least one statutory aggravating circumstance beyond a reasonable doubt, then the Court must engage in the weighing process as envisioned by § 4209(d)(1)b.

In light of the above, the Court will first determine whether or not the State has proved the existence of at least one statutory aggravating circumstance beyond a reasonable doubt.

## STATUTORY AGGRAVATING CIRCUMSTANCES

The State has established to the Court's satisfaction beyond a reasonable doubt that the murder was committed while the defendant was engaged in the attempted commission of robbery in the first degree. This

---

16. The jury had been instructed that they were required by law to so find. *See:* 11 *Del.C.* § 4209(e)(2). However, by a vote of eight to four, the jury found that the murder had not been committed for pecuniary gain.

conclusion is foregone since the jury convicted Rodriguez of felony murder (Count VII) and attempted robbery in the first degree (Count IV) following the trial of this case. *See* 11 *Del.C.* § 4209(e)(2). Ample evidence supported these convictions.

■ The Court is not satisfied that the State has established beyond a reasonable doubt that the murder was committed for pecuniary gain. To establish this circumstance, the evidence must show beyond a reasonable doubt that the hope of financial gain supplied the impetus for the murder. *See State v. Correll*, 148 Ariz. 468, 479, 715 P.2d 721, 732 (1986). Here, while it is clear that the hope of financial gain supplied the impetus for the attempted robbery, no such showing was made with regard to the murder.

## NON–STATUTORY AGGRAVATING CIRCUMSTANCES

The Court finds that sufficient and substantial reliable evidence exists supportive of the following non-statutory aggravating circumstances which bear upon the particular circumstances or details of the commission of the offense and the character and propensities of the offender.[17]

### A. VICTIM IMPACT

■ The wife of Dinendra Jariwala testified as to the pain and trauma which her husband's death has caused her and her family. He is sorely missed. Such evidence is admissible in a penalty hearing because it does not violate the Eighth Amendment of the United States Constitution. *Payne v. Tennessee*, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). The *Payne* Court found that there is nothing unfair in allowing the factfinder to bear in mind the harm caused by the victim's death as an aggravating circumstance at the same time that it considers mitigating evidence introduced by the defendant. 501 U.S. at 824–28, 111 S.Ct. at 2608–09.

The Delaware Supreme Court has concluded that under Delaware's death penalty statute there is no reason to treat victim impact evidence any differently than other relevant evidence is treated, and that the Delaware capital punishment statute requires the merits of admitting such evidence to be considered by the Superior Court. *See Petition of State of Del.*, Del.Supr., 597 A.2d 1 (1991).

This Court has so considered and concludes that such evidence is clearly relevant and does not render this proceeding fundamentally unfair. *Payne*, 501 U.S. at 831, 111 S.Ct. at 2612 (O'Connor, J., concurring). The Court considers this evidence as bearing upon the particular circumstances of the offense of murder in the first degree for which the appropriate sentence must be imposed. *See* 11 *Del.C.* § 4209(d)(1)b.; *see also* 11 *Del.C.* § 4331.

While the Court has considered the testimony of Mrs. Jariwala and the testimony of Mr. Shah, a close friend of the deceased, the Court feels that such victim impact evidence must be placed in its proper perspective. In cases of· violent crime and especially homicide, the trauma suffered by the victim's family and friends is bound to be great. While the Court fully appreciates the consequences which have resulted from the death of Dinendra Jariwala, and considers these consequences from the standpoint of the victim's family and friends to be an aggravating circumstance, the Court will not give undue weight to this victim impact evidence.

Nevertheless, one thing must be said. It is abundantly clear from the testimony that Dinendra Jariwala was a most upstanding citizen. He was a dedicated family man and civic leader. He was active with his temple, the Boy Scouts, the Lion's Club and his community. He had established a caring and loving relationship with his sons who miss him very much. He was, in brief, a good and decent individual, and our State is deprived on account of his loss.

### B. DEFENDANT'S JUVENILE RECORD

1. Philadelphia police officer Rosemary Kulick observed the defendant, then a juve-

---

**17.** The Court rejects as an aggravating circumstance testimony regarding the defendant's fami-

ly life. In fact, the Court considers this to be a mitigating circumstance. *See infra.*

nile, assaulting another male with a baseball bat on May 4, 1989. She saw the defendant strike the victim several times with a bat. After separating them and removing the bat from the defendant's possession, she observed the defendant approach a parked motor vehicle in an attempt to retrieve another baseball bat. A check on the vehicle, a 1988 Toyota, indicated that it had been stolen. Although he was arrested on charges of aggravated assault and receiving stolen goods (the vehicle), there was no adjudication of delinquency because the victims did not appear for trial. Because of the eyewitness testimony, the Court deems the evidence of the assault to be reliable and, thus, considers this incident to be an aggravating circumstance, showing as it does, a propensity for violence. At the time of this incident, the defendant was approximately 16½ years old.

2. Officer Welelski of the Philadelphia Police Department was attempting to make a drug arrest on August 31, 1990. During the course of this attempted arrest, he observed the defendant driving a vehicle which lacked a Pennsylvania inspection sticker. The trunk lock was also missing. He followed the vehicle and stopped it. Three Hispanic male passengers got out and ran. The defendant got out of the driver's seat. The vehicle had been reported stolen on August 27, 1990, from Newark, Delaware.

The defendant was arrested for receiving stolen property and unauthorized use of a motor vehicle. He was adjudicated delinquent. At the time of this incident, he was 17½ years old.

3. On October 21, 1990, Philadelphia police officer Lewis Hause observed the defendant secreting drugs in the wheel base of a motor vehicle. He retrieved a total of 24 green plastic packets of what later was determined to be cocaine. The defendant, who was approaching his eighteenth birthday, was arrested and adjudicated delinquent on the charge of knowingly possessing a controlled substance.

4. Six days later, on October 27, 1990, Officer Walter Rice of the Philadelphia Highway Patrol observed the defendant selling drugs to another male. Officer Rice arrested the defendant and recovered from him a total

of 50 bags of a substance later proved to be cocaine. Subsequently, the defendant was adjudicated delinquent on the charges of possession of a controlled substance and possession with the intent to deliver a controlled substance.

The defendant's juvenile record reflects a life of a young hoodlum who engaged in assaultive behavior, theft and drug dealing. The Court considers this record as an aggravating circumstance.

## C. DEFENDANT'S TWO PENNSYLVANIA ROBBERY CONVICTIONS AND THE CIRCUMSTANCES SURROUNDING THOSE INCIDENTS

1. Fifteen days after the murder of Dinendra Jariwala, on November 3, 1991, at approximately 7 p.m., two Hispanic males walked into the Wawa Food Market located in West Goshen, Pennsylvania, and proceeded to rob it. One was described as an Hispanic male wearing a Raiders jacket which extended down to his mid-thigh area. He was carrying a small silver or chrome-plated gun in his hand. He had the employee, Mark Moyer, lie on the floor, and he pointed the handgun at Moyer's head from a distance of two feet. This robber was positively identified as being Jose Rodriguez. Money was taken in this robbery. Apparently, it was not enough, for the robbers then made their way to Upper Chichester, Pennsylvania, where they proceeded to commit another robbery.

2. In the late evening of November 3, 1991, Jose Rodriguez and another Hispanic male robbed the Wawa Food Market in Upper Chichester, Pennsylvania. During the course of this robbery, the defendant put his arm around the neck of Cathy Surdel while holding a gun to her temple. He told her, "If you set off the alarm, we'll blow your heads off."

The other robber made his way to the rear of the store with another employee, Teresa Brinsfield. The defendant took Ms. Surdel to the front counter where the safe and cash register were located. He stole money from a charity donation jar on the counter. While there, a uniformed police officer came in to

buy a cup of coffee. The defendant calmly told Ms. Surdel that they were going to play a game. "I'll be a new employee and you're showing me how to do this job."

Ms. Surdel described the defendant as being very calm and quick-thinking. While Ms. Surdel waited on other customers, the defendant bagged their goods. While the defendant wasn't looking, Ms. Surdel hit the silent alarm. As the police officer was leaving the store, the telephone rang. Teresa Brinsfield and Ms. Surdel both answered on two separate extensions and talked to the dispatcher who finally realized that a robbery was in progress. Moments later, police officers stormed the front door. Rodriguez almost escaped by pretending he was an employee or customer. When Rodriguez was at the front door, the police officers having rushed by him in their haste to reach the back room, Ms. Surdel screamed, "Get him."

Rodriguez ran from the store with an officer in pursuit. He was apprehended in the parking lot.

The defendant was convicted of these two robberies and on July 20, 1992, was sentenced in the Delaware County Court of Common Pleas of the Commonwealth of Pennsylvania to from five to twenty years of incarceration for each robbery, the sentences to run concurrently.

Even the murder of an innocent human being did not stop Jose Rodriguez from pursuing his chosen path of crime and violence.

The Court considers these robbery convictions and the circumstances surrounding these robberies [18] as an aggravating circumstance.

## D. THE VICTIM WAS DEFENSELESS [19]

The Court considers the fact that the victim, Dinendra Jariwala, was unarmed when he was gunned down during the course of the attempted robbery to be an aggravating circumstance.

## MITIGATING CIRCUMSTANCES

The Court must consider any evidence in mitigation in determining the appropriateness of a life or death sentence. *Lockett v. Ohio*, 438 U.S. 586, 604, 98 S.Ct. 2954, 2964, 57 L.Ed.2d 973 (1978). Throughout the penalty hearing, the Court listened carefully for evidence of any nature which could be fairly characterized as a mitigating circumstance. With the above in mind, the Court concludes that evidence exists which support the following mitigating circumstances which bear upon the particular circumstances or details of the commission of the offense and the character and propensities of the offender.[20]

## A. DEFENDANT'S AGE

The defendant, who was born on December 3, 1972, was six weeks shy of his nineteenth birthday at the time of the October 19, 1991, attempted robbery/murder. The

---

**18.** It is appropriate to consider evidence relating to the details of any prior felony conviction involving the use or threat of violence, since such evidence is germane vis-a-vis the defendant's character and propensities. *Rhodes v. State*, Fla. Supr., 547 So.2d 1201 (1989); *Red Dog v. State*, *supra* at 307. If the details of a prior felony conviction involving the use of or threat of violence is relevant, then surely such evidence following a murder is at least equally as relevant.

**19.** This circumstance is listed as a statutory aggravating circumstance, 11 *Del.C.* § 4209(e)(1)s., but was ruled to be unconstitutionally broad and vague. *See State v. White*, Del.Supr. 395 A.2d 1082 (1978).

**20.** The Court rejects as a mitigating factor the assertion that the defendant was under the influence or domination of an older person, namely Angel Carabello. The defendant knew right from

wrong and any decision to join Carabello's criminal enterprise was made of his own free will. *Compare Witt v. State*, Fla.Supr., 342 So.2d 497 (1977) (life sentence justified for co-defendant, an eighteen-year-old male who suffered from severe mental and emotional disturbance and who was subject to domination by thirty-year-old defendant who received sentence of death).

Further, the Court rejects mercy as a mitigating circumstance in this case. Jose Rodriguez's request for mercy and his protestations of remorse which were made to the jury pursuant to 11 *Del.C.* § 4209(c)(2) at the end of the penalty phase and immediately before the attorneys' closing arguments constitutes, in the Court's view, a hollow plea. The Court notes that Dr. Rosalind Kingsley's psychological report regarding her December 8, 1992, evaluation of the defendant stated that, "He speaks of a certain amount of remorse which he feels for *his* family with regard to his criminal activity." (Emphasis added.)

Court considers the defendant's age to be a mitigating circumstance but, in light of his juvenile record, attributes little weight to this circumstance. *See State v. Roscoe*, 145 Ariz. 212, 700 P.2d 1312 (1984) (court may consider defendant's age in the light of his prior criminal history); *State v. Gerlaugh*, 144 Ariz. 449, 698 P.2d 694 (1985) (defendant's youth not a substantial mitigating factor since defendant had prior conviction of armed robbery at age of seventeen). Here, Rodriguez had shown assaultive propensities as a juvenile. Moreover, he had been convicted of theft-related and drug offenses.

## B. DEFENDANT'S LIMITED INTELLECTUAL CAPACITY

Dr. Rosalind Kingsley, a licensed psychologist, evaluated the defendant on December 8, 1992, while he was incarcerated at Graterford Prison in Graterford, Pennsylvania. The Wechsler Adult Intelligence Scale showed the defendant's Full Scale Score to be 77, which puts him in the seventh percentile.[21]

Dr. Kingsley opined that the defendant had no strong male role model and observed that he was apparently a street-wise, alcoholic drug dealer by the age of sixteen. She stated that he knew what he wanted, and he was going to get it.

In light of the defendant's almost incredible coolness during the course of the November 3, 1991, robbery at the Upper Chichester Wawa Food Market, it is hard to accept the defendant's limited intellectual capacity as a mitigating circumstance. Yet, the Court will do so, at the same time finding this mitigating circumstance to be of limited weight.

## C. DEFENDANT'S FAMILY BACKGROUND

Family background is a recognized mitigating circumstance.[22] The defendant grew up in a high-crime, drug-infested Hispanic section of Philadelphia. His father left the defendant's family when the defendant was five years old. Rodriguez's mother has always worked hard, struggling to make ends meet. Rodriguez has two older sisters, Elizabeth and Ebelinda. Crime has been a constant facet of their lives. Elizabeth Rodriguez is serving a prison sentence in Delaware on account of a drug conviction. The father of Ebelinda's six-year-old child is serving a prison sentence. The defendant grew up in the streets of Philadelphia without the advantage of having had a father figure. He dropped out of school while in the seventh grade. By his mid-teens, he was heavily involved with alcohol and drugs. He could obtain only menial jobs as a legitimate source of income.

The Court considers the defendant's family background as a mitigating circumstance. At the same time, not much weight will be given to this factor. Countless Americans throughout our history have risen out of poverty to become productive citizens. Jose

---

21. Ninety-three out of one-hundred individuals would perform better, while six would perform worse. The results show, however, that the defendant is not clinically defective. Dr. Kingsley noted in her evaluation report that he is bilingual, speaking Spanish and English equally well.

22. *See Eddings v. Oklahoma*, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982) (defendant, sixteen years old at time of murder and emotionally underdeveloped, had been raised without proper guidance first by an alcoholic mother who was possibly a prostitute and then by father who used excessive physical punishment); *Hitchcock v. Dugger*, 481 U.S. 393, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987) (defendant, twenty years old at time of murder, had been one of seven children in a poor family that earned its living by picking cotton); *Brown v. State*, Fla.Supr., 526 So.2d 903 (1988) (defendant, a borderline defective eighteen-year-old, emotionally functioning as a dis- turbed child at time of murder, had an impoverished background and abusive parents). The cases indicate that the younger the defendant, the more weight is given to this mitigating circumstance. As the Supreme Court stated in *Eddings, supra:*

> ... Eddings was a youth of 16 years at the time of the murder. Evidence of a difficult family history and of emotional disturbance is typically introduced by defendants in mitigation. *See McGautha v. California*, 402 U.S. 183, 187–188, 193, 91 S.Ct. 1454 [1457–1458], 28 L.Ed. 711 (1971). In some cases, such evidence properly may be given little weight. But when the defendant was 16 years old at the time of the offense there can be no doubt that evidence of a turbulent family history, of beatings by a harsh father, and of severe emotional disturbance is particularly relevant.

*Id.* 455 U.S. at 115, 102 S.Ct. at 877.

Rodriguez, on the other hand, succumbed to the temptations of the urban jungle and followed a path of thievery, drug dealing, robbery and, ultimately, murder.

## D. DEFENDANT'S HISTORY OF DRUG AND ALCOHOL ABUSE

Substantial evidence of a defendant's long history of alcohol and/or drug abuse has been recognized as a mitigating circumstance which the Court must consider in the weighing process. *See Hall v. State*, Fla.Supr., 541 So.2d 1125 (1989); *Amazon v. State*, Fla. Supr., 487 So.2d 8 (1986); *Red Dog v. State*, 616 A.2d at 309 n. 14. I accept the evidence suggestive of Jose Rodriguez's alcohol and drug abuse as a mitigating circumstance in this case.

## E. DEFENDANT'S POTENTIAL FOR REHABILITATION

Pastor Bethon came to know the defendant while performing his ministerial duties at Graterford Prison. Rodriguez regularly attended Tuesday services, and Pastor Bethon spoke with him twenty to thirty times on these occasions. He felt that the defendant was a young man swept under by a life which offered no positive alternatives. He noted that the defendant grew up in a high-crime area where drug activity is heavy.

Dr. Kingsley noted in her report that, "He seems to have found a religious road since his incarceration. He hopes to become a minister."

The defendant's mother and sister regularly visit him in prison. They indicate that they will continue to do so. Dr. Kingsley noted that Rodriguez has the ability to conform to prison life.

The potential for rehabilitation constitutes a valid mitigating circumstance. *Brown v. State*, Fla.Supr., 526 So.2d 903 (1988). The Court considers the defendant's potential for rehabilitation to be a mitigating circumstance in this case.

## F. DISPOSITION OF CO-DEFENDANTS' CHARGES

While recognizing that capital case sentencing considerations should be individualized, *see Tison v. Arizona*, 481 U.S. at 149, 107 S.Ct. at 1683 ("the focus [had to] be on *his* culpability, not on that of those who committed the robbery and shot the victims, for we insist on 'individualized consideration as a constitutional requirement in imposing the death sentence.'" (emphasis in original)), the Court notes that James Perez was convicted of both felony murder and intentional murder yet was spared the death penalty. Here, Jose Rodriguez was convicted of felony murder but was acquitted of intentional murder. Additionally, Angel Carabello, who likely was the instigator of the robbery spree in which Rodriguez participated, was permitted to plead *nolo contendere* to lesser charges in exchange for which the State dropped the murder charges against him.

A death sentence for Rodriguez, under the circumstances here present, would at least appear to be incongruous. In any event, since there is no proof beyond a reasonable doubt as to who fired the fatal shots which killed Dinendra Jariwala, the Court will consider the disposition of Rodriguez's co-defendants' charges as a mitigating circumstance. *See Riley v. State*, Del.Supr., 585 A.2d 719, 730 (1990) (fact that co-defendant, who was the actual killer, received lesser penalty as a result of a plea bargain considered in mitigation); *Wright v. State*, Del.Supr., 633 A.2d 329, 342 (1993) (when evidence points to defendant as the triggerman, there is no reason to consider disposition of co-defendant's charges as mitigating circumstance).

## G. THE ABSENCE OF PROOF BEYOND A REASONABLE DOUBT THAT THE DEFENDANT'S ACTIONS IN CONNECTION WITH THE DEATH OF DINENDRA JARIWALA DEMONSTRATED A RECKLESS INDIFFERENCE TO HUMAN LIFE

This circumstance must be accorded determinative weight, for without such a showing, in the circumstances here present, the death

penalty cannot be imposed.[23] *See Tison v. Arizona, supra.* A full discussion of this circumstance follows.

## THE WEIGHING PROCESS

The weighing process is, of course, contingent upon the Court's finding of at least one statutory aggravating factor beyond a reasonable doubt. Here, since such a finding has been rendered, the Court now undertakes the second prong of the equation, mindful that:

> The procedure to be followed by the trial judges ... is not a mere counting process of X number of aggravating circumstances and Y number of mitigating circumstances, but rather a reasoned judgment as to what factual situations require the imposition of death and which can be satisfied by life imprisonment in light of the totality of the circumstances present.

*Delaware v. Cohen, et al.,* Del.Supr., 604 A.2d 846, 849 (1992) (citing *State v. Dixon,* Fla. Supr., 283 So.2d 1, 10 (1973)).

Moreover, the weighing of aggravating and mitigating circumstances involves a "qualitative" rather than a "quantitative" approach so as to ascertain the appropriate punishment. *Commonwealth v. Holland,* 518 Pa. 405, 543 A.2d 1068 (1988).

Here, the weighing calculus is complicated by the required consideration of the *Enmund/Tison* standard.[24] This is so since, regardless of the Court's conclusion vis-a-vis the relative weight of aggravating circumstances verses mitigating circumstances, the Court is precluded from sentencing Jose Rodriguez to death unless it concludes beyond a reasonable doubt that Rodriguez was

a major participant in the attempted robbery/murder of Dinendra Jariwala and that during the course of that crime he demonstrated a reckless indifference to human life.

■ The Court concludes that the evidence shows beyond a reasonable doubt that Jose Rodriguez was a major participant in the attempted robbery/murder of Dinendra Jariwala. The evidence shows that far from merely sitting in a car away from the actual scene of the murder acting as a getaway driver, Jose Rodriguez was actively involved in every element of the attempted robbery and was physically present during that crime which culminated in the murder of Dinendra Jariwala. Circumstantial evidence showed that seconds after the fatal shots were fired, Rodriguez was seen, along with another Hispanic male, running from the Grape 'N Grain with what appeared to be a gun in his hand.

■ The second prong of the *Enmund/Tison* standard is more troubling. Taking into account the totality of the evidence, direct and circumstantial, and those inferences which one may adduce from such evidence, the Court is left with the inescapable conclusion that the State has failed to prove beyond a reasonable doubt that Jose Rodriguez's actions demonstrated a reckless indifference to human life.

As in *Jackson v. State, supra,* there is no evidence to indicate an anticipated killing. The evidence is consistent with the theory that Mr. Jariwala resisted the robbery, inducing the gunman to fire his weapon. There is no evidence of a fully-formed conscious purpose to kill. There is no evidence in this record that Rodriguez fired the shots that killed Mr. Jariwala. A reasonable infer-

---

**23.** It can be argued forcefully that with the presence of what the Court has characterized as this mitigating circumstance, making a determination as to whether the aggravating circumstances outweigh the mitigating circumstances becomes a superfluous exercise. This is so since regardless of the outcome of that determination, a death sentence cannot be imposed in this case, 11 *Del.C.* § 4209(d) to the contrary notwithstanding.

The Court, I suppose, could have made this determination prior to the commencement of the penalty hearing. Nevertheless, the remote possibility of a change of heart on the part of James Perez, whereby he would testify at Rodriguez's

penalty hearing, led the Court to conclude that justice dictated a penalty hearing in this case. Moreover, it is the Court's hope that this sentencing opinion will dissuade those in the distant future who are in a position to do so, from ever contemplating a commutation of sentence for this violent criminal.

**24.** *See State v. Emery, supra,* 141 Ariz. at 552, 688 P.2d at 178, where the Arizona Supreme Court indicated that there was no need to conduct an independent review of aggravating and mitigating factors since *Enmund* and its Arizona progeny precluded a sentence of death.

ence could be drawn from the record evidence that either of the two robbers fired the fatal shots. There was no evidence that Rodriguez expected violence to erupt during the robbery. There was no real opportunity for Rodriguez to prevent the murder since it occurred suddenly, without apparent deliberation. And, as in *White v. State, supra,* where a witness had testified that he had seen White leaving the scene with a gun in his hand, there is nothing to show that this gun was the murder weapon or that it had even been fired. Neither the murder weapon nor any other gun was recovered as evidence. The evidence before the jury is wholly consistent with numerous other scenarios by which Jose Rodriguez did not kill or anticipate a killing. "What is important is that nothing in the record offers the [fact-finder] a rational basis for selecting one hypothesis over the other." *Id.* at 1221.

As with the case of *Jones v. Thigpen, supra,* the record does not indicate whether Rodriguez or his accomplice did the actual killing. The State's case consisted only of the testimony of witnesses who observed Rodriguez outside of the store and later departing the store. The *Enmund/Tison* standard "undoubtedly, and unfortunately in this case, requires more." *Id.* at 817. In brief, the evidence falls short of demonstrating beyond a reasonable doubt a reckless indifference to human life on the part of Jose Rodri-

guez. It follows that a death sentence may not constitutionally be imposed in this case.[25] The Court can say, without hesitation, that had the *Enmund/Tison* culpability requirement been satisfied, the aggravating circumstances clearly would have outweighed the mitigating circumstances and a sentence of death would have been imposed.

One final point. The evidence adduced at the penalty phase when juxtaposed with the trial evidence paints a portrait of a violence-prone predator whose ethical standards do not contemplate consideration for innocent victims. Jose Rodriguez is a societal parasite who rightly deserves never to experience freedom again.

## CONCLUSION

The Court concludes that as to Count VII of the indictment, the sentence shall be imprisonment for the remainder of the defendant's natural life without benefit of probation or parole or any other reduction.

It Is So ORDERED.

---

25. The recent Delaware Supreme Court case of *Wright v. State, supra,* is easily distinguishable from the case at bar. No *Enmund/Tison* issue was even raised in *Wright* since there the defendant had been convicted of both intentional murder and felony murder, and "... the evidence strongly suggested, if not conclusively proved, that Wright was the sole triggerman." 633 A.2d at 342.